**GEORGIA POWER COMPANY, Plaintiff-Appellant, Cross-Appellee,**

**v.**

**CIMARRON COAL CORPORATION, Defendant-Appellee, Cross-Appellant.**

Nos. 75–1542, 75–1543.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 1, 1975.

Decided Dec. 9, 1975.

Certiorari Denied April 26, 1976. See 96 S.Ct. 1727.

Martin Roach, Roach, Cox & Brown, Louisville, Ky., Allen E. Lockerman, Michael C. Murphy, J. Kirk Quillian, Troutman, Sanders, Lockerman & Ashmore, Atlanta, Ga., for plaintiff-appellant, cross-appellee.

John Scott McGaw, Moore, Morrow, Frymire & McGaw, Madisonville, Ky., W. Stuart McCloy, Sr., W. Stuart McCloy, Jr., McCloy, Dudley, Yawn & McCloy, Memphis, Tenn., for defendant-appellee, cross-appellant.

Before PHILLIPS, Chief Judge, and MILLER and LIVELY, Circuit Judges.

LIVELY, Circuit Judge.

The issue in this case is whether a dispute between the parties to a long-term fuel supply agreement is subject to

arbitration. The coal supply agreement (Agreement) provided that for a period of ten years beginning January 1, 1970 Cimarron would "tender for delivery" and Georgia Power would purchase quantities of coal set out therein. The Agreement provided for a base price per ton of coal of $4.03 as of the date of the Agreement "subject to adjustment from time to time . . . ." Specific provisions of the Agreement dealt with the computation of adjustments in base price for changes in certain labor costs, supplies and changes in "governmental impositions." Each such adjustment was to be computed according to a formula or method set forth in the Agreement. The Agreement also contained the following provision:

26.01. *Adjustments for Gross Inequities.* Any gross proven inequity that may result in unusual economic conditions not contemplated by the parties at the time of the execution of this Agreement may be corrected by mutual consent. Each party shall in the case of a claim of gross inequity furnish the other with whatever documentary evidence may be necessary to assist in affecting a settlement.

Nothing contained in this section shall be construed as relieving either the Purchaser or Seller from any of its respective obligations hereunder solely because of the existence of a claim of inequity or the failure of the parties to reach an agreement with respect thereto.

As the parties operated under the Agreement several increases in base price were made pursuant to the various provisions for adjustments, including the gross inequities provision of Section 26.-01.

During 1973 and 1974 there was a rapid escalation in the market price of coal in the United States. Sometime prior to April 11, 1974 Cimarron requested an adjustment in the base price under Section 26.01 of the Agreement, claiming that a gross inequity had resulted from the disparity between the market price of coal and the price being paid under the Agreement. In responding to this request on April 11, Georgia Power wrote: "As you are aware, we adamantly rejected and disagreed with your request for escalation based upon Section 26.01 of the Coal Supply Agreement. We did acknowledge, however, that a substantial disagreement existed over the interpretation of this provision." On August 15, 1974 Cimarron requested an additional price adjustment under Section 26.01, pointing out that the current adjusted base price under the Agreement was $10.00 per ton while coal of the same quality was selling for $29.00 to $32.00 per ton on the open market. Because of "the very unusual economic conditions existing in the coal industry at this time . . . ," Cimarron requested a change in base price to $16.50 per ton. Georgia Power rejected the request, but offered to meet with Cimarron and discuss the matter. During the succeeding months an adjustment in base price was agreed to by the parties primarily on the basis of increased costs of materials and supplies, bringing the base price when suit was filed to $10.41 per ton.

On November 1, 1974, Cimarron notified Georgia Power that it was increasing the base price for coal to $27.50 per ton effective November 5, 1974 and that "[w]e expect to suspend deliveries of coal to you on November 1, 1974, unless the basic price adjustment to become effective that day is agreed to or submitted to arbitration." Georgia Power responded by telegram November 5, 1974, stating in part:

In view of the above, if Cimarron ceases shipments on November 5, 1974, as threatened, we will have to immediately seek judicial enforcement of the contract, and you should be governed accordingly.

On November 7, 1974 Georgia Power filed its complaint in the United States District Court for the Western District of Kentucky where Cimarron is located. After reciting the material facts and setting forth its theory Georgia Power sought a temporary restraining order to

prevent Cimarron from disposing of coal from the property subject to the Agreement to any purchaser other than Georgia Power until the commitments of the contract were fulfilled and from failing to produce and sell to Georgia Power the amounts of coal agreed to in the contract. In an amended and substituted complaint filed on November 13, 1974 Georgia Power also sought a declaratory judgment that Section 26.01 of the Agreement does not provide a means for increasing the price of coal without consent of Georgia Power and that Section 26.01 is not arbitrable, and a further declaration that Georgia Power had not breached the Agreement by its refusal to arbitrate the dispute.

The district court declined to enter a temporary restraining order, but obtained agreement of the parties to the entry of a status quo order by which Cimarron continued to ship to Georgia Power the quantities of coal provided for in the Agreement at the prices set therein until a decision on the merits. It further provided that if it should ultimately be determined that Cimarron was entitled to a price increase under Section 26.01, such increase would apply to coal shipped under the status quo order. Thereafter Cimarron filed an answer in which it contended that Georgia Power had breached the Agreement by refusing to submit an unresolved controversy to arbitration and that by suing in the district court Georgia Power had waived its right to arbitration. Cimarron denied that it had breached the Agreement in any respect and stated affirmatively that the provision of the contract for arbitration contains no limitation on the subject matter of arbitration. Cimarron also filed a "cross-claim," which appears actually to be a counter-claim, in which it sought damages from Georgia Power for the coal shipped under the status quo order measured by the difference between the contract price and the prevailing market price for coal of equal quality at the time of delivery.

Following a hearing on the merits, the district court entered a judgment hold-ing that the Agreement between the parties remained in full force and effect and directing that "the parties shall proceed without delay to arbitration of the defendant's claims asserted under Section 26.01 of said contract." The judgment also provided that the status quo order should remain in effect. District Judge James F. Gordon filed a memorandum opinion containing findings of fact and conclusions of law. Georgia Power appealed from that portion of the judgment directing arbitration and from rulings during the trial of the case in which the district court declined to admit evidence regarding the financial condition of the parties. Cimarron has cross-appealed from that portion of the judgment which denied it damages as claimed in its "cross-complaint"; from the holding that Cimarron had no right to rescind the contract upon Georgia Power's refusal to arbitrate and from the court's ruling that Georgia Power did not waive its right to seek judicial enforcement of arbitration or a declaratory judgment by reason of its refusal to arbitrate. The appeal and cross-appeal were consolidated for hearing in this court.

Section 20.01 of the Agreement provides:

> 20.01. *Arbitration.* Any unresolved controversy between the parties, arising under this Agreement shall, at the request of either party, be submitted to arbitration under the rules of the American Arbitration Association. The cost and expense of any arbitration shall be shared equally by the parties, unless otherwise ordered by the arbitrator.

Georgia Power contends that Section 26.01 provides a purely permissive method of relieving a party from a gross inequity, but that its language is inconsistent with a requirement of binding arbitration. This position is based on the fact that Section 26.01 provides relief from gross inequities only "by mutual consent." It points to the fact that no criteria for gross inequity adjustments are contained in the Agreement, contrary to

the provisions for adjustment on account of other changes in circumstances. Thus Georgia Power basically argues that a provision of an agreement which permits modification of any of its terms by mutual agreement of the parties may only lead to such modification if the parties do agree. To permit a dispute under such a provision to be settled by arbitration, it is argued, would permit the arbitrator to make a new contract for the parties.

Georgia Power relies principally upon the decision in *Necchi v. Necchi Sewing Machine Sales Corp.,* 348 F.2d 693 (2d Cir. 1965), *cert. denied,* 383 U.S. 909, 86 S.Ct. 892, 15 L.Ed.2d 664 (1966). There the court held that a contractual provision that six months before the expiration of the agreement the parties "shall examine the possibility of executing a new and, it is hoped, long term distributorship agreement for the same territory and at such terms and conditions as will be then discussed and defined" was not arbitrable. *Id.* at 698. The court found that there was no obligation upon Necchi to renew the distributorship and no provision for relief if it failed to examine the possibility of renewal. Speaking through Judge (now Justice) Marshall the court said, "Certainly, we cannot ask that a renewal contract be written for the parties, as it is altogether too conjectural that the parties would have agreed and on what terms." *Id.* This conclusion was reached even though the agreement contained a broad provision for arbitration of "[a]ll matters, disputes or disagreements arising out of or in connection with this Agreement . . . ." *Id.* at 695.

The present case is quite different from *Necchi.* There the parties sought to enforce a provision for renewal which did no more than require the parties to examine the possibility of entering into a new agreement. The dispute did not concern operations under the agreement and the language of the renewal provision presented nothing for the arbitrator, or a court, to enforce. On the other hand, in the case now under review a dispute arose during the life of a subsisting contract with respect to a present adjustment in prices on the basis of a condition which was recognized by the parties as a possibility when the contract was entered into. There is a difference between a provision which requires parties to attempt to agree on a new contract and one which requires them to attempt to make an adjustment in price under an ongoing contract by mutual consent. Under the former situation in the absence of a new agreement there is no contract to enforce either by arbitration or judicial proceedings. In the latter case the parties remain bound to continued operations under their contract and the controversy over a claimed right to price adjustment must be settled somehow in the absence of mutual consent. In such a case if the contract provides for arbitration, the arbitrator is only required to resolve a controversy arising under the agreement of the parties, not write a new agreement for them.

The mere fact that it provided for correction of gross inequities by mutual consent did not remove Section 26.-01 from arbitrability. The *Necchi* court has so held in cases where the fashioning of a renewal was not involved. In *American Home Assurance Co. v. American Fidelity & Casualty Co.,* 356 F.2d 690 (2d Cir. 1966), a contractual provision for a reduction of reinsurance premiums "on a basis to be mutually arranged" was held to be arbitrable. In *Aeronaves de Mexico S. A. v. Triangle Aviation Services, Inc.,* 389 F.Supp. 1388 (S.D.N.Y. 1974), *aff'd,* 515 F.2d 504 (2d Cir. 1975), a dispute under a provision that increases in charges for servicing airplanes "will be negotiated to the satisfaction of both parties" was held to be arbitrable. Georgia Power's reliance on *Beech Aircraft Corp. v. Ross,* 155 F.2d 615 (10th Cir. 1946), is misplaced. The contract under consideration in that case contained no arbitration provision. Under those circumstances the court held that a provision for price changes to be effected "by mutual agreement," in the ab-

sence of a formula for final revision of prices, did not provide an acceptable standard by which a court could give effect to the intention of the parties. The reasoning of the court in the *Beech Aircraft* decision does not compel the same result in a case where the parties have agreed in advance to submit unresolved controversies to arbitration.

In their briefs both parties have recognized that there is a strong federal policy in favor of arbitration. This is true in the realm of commercial transactions as well as labor relations. Nevertheless, as this court has held, " . . . arbitration is a matter of contract between the parties, and one cannot be required to submit to arbitration a dispute which it has not agreed to submit to arbitration." *United Steelworkers, Local No. 1617 v. General Fireproofing Co.*, 464 F.2d 726, 729 (6th Cir. 1972). The language of the arbitration clause in the Agreement before us is as broad and general as one can conceive. Though Section 26.01 makes no direct reference to arbitration, whereas several other provisions of the contract do refer to the requirement of arbitration, nevertheless we conclude that if the parties had not intended for controversies arising under Section 26.01 to be submitted to arbitration the Agreement would have so provided. The intention of the parties must be determined from the entire agreement. This court has stated that " . . . arbitration should not be denied unless it may be said with positive assurance that the clause does not cover the dispute." *American Radiator & Standard Sanitary Corp. v. Local 7, International Brotherhood of Operative Potters, AFL–CIO*, 358 F.2d 455, 458 (6th Cir. 1966). While some of the provisions of the contract make reference to the arbitration requirement, there is no indication or statement that any provision of the contract is wholly outside of the arbitration provision. The gross inequities provision deals with a possible adjustment in price which might be required because of unforeseeable changes in the economic climate of the coal industry. This provision lacks the specific details of the other portions of the Agreement dealing with price adjustment, but that arises from the fact that it is something of a "catch-all" provision designed to take care of the kinds of changes which cannot be predicted in detail, but which experience teaches do occur. In the absence of language withdrawing this provision from the arbitration requirement it is the duty of the court to resolve any doubts in favor of arbitration. *American Radiator v. Local 7, supra* at 458.

When the parties to a contract foresee the possibility of a change in circumstances which might require modification of the contractual terms and provide for modification by mutual consent, and thereafter are unable to agree upon such modification, the resulting dispute is subject to a broad arbitration provision such as that contained in the Agreement now before the court. The fact that contracting parties agree in general terms to arbitration of disputes indicates a determination that their interests will be better served by arbitration than by resort to the courts if problems arise. The nature of a dispute which thereafter actually occurs is immaterial. As Judge Learned Hand wrote in *Shanferoke Coal & Supply Corp. v. Westchester Service Corp.*, 70 F.2d 297, 299 (2d Cir. 1934); *aff'd*, 293 U.S. 449, 55 S.Ct. 313, 79 L.Ed. 583 (1935): "If the clause is general in form, it makes no difference what may come up under it."

Georgia Power also argues that the Supreme Court recognized a federal policy in favor of stabilization of the fuel costs of public utilities in *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961), and that policy would be violated by permitting arbitration of a claim for a price increase based on an asserted gross inequity. The short answer to this contention is that the *Tampa Electric* case was not concerned with arbitration or with the application of the gross inequities provision in the coal contract between

Tampa Electric and Nashville Coal. *Tampa Electric* was an antitrust case, and the issues before the Court were entirely different from those under consideration in the present case.

■ The second issue raised by Georgia Power relates to the refusal of the district court to receive evidence tendered by Georgia Power relating to the financial condition of Cimarron. It is the theory of Georgia Power that it was entitled to show that Cimarron had not suffered economic hardship by reason of increases in the market price of coal and that Cimarron had actually improved its financial condition as a result of the Georgia Power contract. Georgia Power also offered evidence designed to show that it was in a severe financial crisis which would be worsened if Cimarron should be allowed to raise the price of its coal above that provided in the contract. Basically, Georgia Power argues that it was an abuse of equitable discretion for the district court to refuse to receive this evidence. The district court properly declined to consider such evidence. The first question before the district court on Georgia Power's complaint after denying the request for a temporary restraining order was whether the unresolved controversy between the parties under Section 26.01 was arbitrable. It was not the duty of the court to decide whether a gross inequity did in fact exist as claimed by Cimarron. The rejected evidence appears to relate to that issue rather than the question of arbitrability.

■ We find no merit to Georgia Power's arguments based on the provision of the Agreement that it should be construed according to Georgia law. In the present case the district court found that the transaction between Georgia Power and Cimarron is one involving commerce within the meaning of the Federal Arbitration Act and this finding is not questioned on appeal. In *West Point—Pepperell, Inc. v. Multi-Line Industries, Inc.*, 231 Ga. 329, 201 S.E.2d 452, 453 (1973), it was held that "the state law and policy with respect thereto [arbitration] must yield to the paramount federal law."

■■ Cimarron contended in the district court and continues to argue on appeal that Georgia Power breached the Agreement by refusing to arbitrate Cimarron's demand for a price increase under Section 26.01 and as a result Cimarron was entitled to rescind the contract in its entirety. On this theory Cimarron filed its "cross-claim" asking damages in an amount equal to the difference between the contract price at which it has continued to deliver coal under the status quo order and the market price. The district court held that Georgia Power did not breach the Agreement by declining arbitration and filing this action for a judicial determination of arbitrability of the controversy, and that Cimarron had no right to rescind. The record discloses that Georgia Power suggested to Cimarron that it file suit for an order compelling arbitration under Section 4 of the Federal Arbitration Act, 9 U.S.C. § 4. Cimarron did not follow this course of action, nor did it notify the American Arbitration Association of the existence of the controversy. After Cimarron declined to seek judicial enforcement of the arbitration provision under Section 4 and unilaterally declared the contract rescinded, Georgia Power filed this suit seeking, among other things, a declaratory judgment as to the arbitrability of a controversy under Section 26.01 of the Agreement. Georgia Power continued to insist on performance of the contract by Cimarron and submitted the issue of arbitrability to the district court. A party does not act at its peril in seeking an initial judicial determination of whether an arbitration clause applies to a particular dispute arising under an agreement. *General Guaranty Insurance Co. v. New Orleans General Agency, Inc.*, 427 F.2d 924 (5th Cir. 1970). To hold that one who seeks such a judicial determination has breached the entire agreement out of which the controversy arose would tend to make parties reluctant to agree to arbitration and would run counter to the policy in favor thereof. In *Galt v.*

108

*Libbey-Owens-Ford Glass Co.,* 376 F.2d 711 (7th Cir. 1967), relied upon by Cimarron, a party was held to have repudiated its agreement to arbitrate, giving the other party an election to forego arbitration or insist upon it. Georgia Power did not repudiate the Agreement by bringing this action, and Cimarron had no right to rescind.

The judgment of the district court is affirmed on appeal and cross-appeal. No costs allowed.