**WHITE RIVER VALLEY BROADCASTERS, INC., Plaintiff,**

v.

**WILLIAM B. TANNER CO., Defendant,**

**Roy A. Henderson, Third-Party Defendant.**

**No. B–78–C–3.**

United States District Court, E. D. Arkansas, N. D.

April 25, 1979.

John C. Gregg, Batesville, Ark., for plaintiff.

H. David Blair, Batesville, Ark., for defendant.

## OPINION

ARNOLD, Circuit Judge, sitting by designation.

This action arises out of three contracts allegedly binding plaintiff, White River Valley Broadcasters, Inc., the licensee of radio station KBTA in Batesville, Arkansas, to buy certain prerecorded music and other program materials from defendant, William B. Tanner Co., which is a citizen of Tennessee for diversity purposes. White River brought suit in the Chancery Court of Independence County, Arkansas, for a declaratory judgment that the contracts were not enforceable against it, on the theory that Roy A. Henderson, its employee who executed the contracts, lacked authority. The case was removed to this Court by Tanner, which in due course counterclaimed for a declaration that the contracts were enforceable and for damages. As part of its counterclaim, Tanner claimed that White River had repudiated the contracts, thus entitling it to treat the case as if a complete breach had occurred and recover damages. White River, in its capacity as a defendant to this counterclaim, filed a third-party complaint against Roy Henderson, claiming that if it, White River, should turn out to be liable to Tanner, Henderson should reimburse it because he had acted without authority. The third-party complaint was dismissed with prejudice before trial, so only the original complaint and the counterclaim remain to be decided.

The case was tried to the Court, sitting without a jury by agreement of the parties, on March 3 and 4, 1980. In addition to oral testimony and exhibits, five depositions were received in evidence. The Court has read these depositions, reviewed its notes of the oral testimony, and read each of the documentary exhibits. The Court now makes its findings of fact and conclusions of law.

Roy Henderson was first employed by White River in 1967, and stayed with the station until March of 1977. In 1975, when the first two contracts in suit were signed, Mr. Henderson was station manager. He was also a corporate vice-president and a member of the Board of Directors, having first been elected a director on January 5, 1970 (PX 7, 8, 9). As station manager, Mr. Henderson was generally in charge of broadcasting. He also served as sales manager, and it was his job to supervise and obtain program materials. In this capacity Mr. Henderson had signed contracts for baseball and wire services. In short, he oversaw the over-all operation of the station. In the fall of 1975, Mr. Henderson and two other men agreed to purchase all of the stock in White River from J. F. Higginbottom and his family. Mr. Higginbottom had been general manager and president. The purchase was conditioned upon approval by the FCC.

On December 18, 1975, Arnold Savereide, a salesman for Tanner, called on Mr. Henderson at KBTA. At that time the station had one contract with Tanner, known as the Creative Sales Services (CSS). This contract (Exhibit I to the Savereide deposition) was dated July 9, 1969. It was still in effect at the end of 1975. Mr. Savereide presented Mr. Henderson with two proposed contracts, one called Air Play International, a contest promotion service, and one called The Advertiser. Mr. Henderson had signed the Air Play contract on one of Mr. Savereide's previous visits, but had wanted a clause to be added to the effect that the contract would become binding only after the FCC approved the change of ownership. On December 18, 1975, the day Mr. Savereide was in the station, Mr. Henderson received notice that the transfer of ownership had been approved by the FCC. He and Mr. Savereide then rewrote the contract and made it unconditional. On this day both Mr. Savereide and Mr. Henderson signed the Air Play and Advertiser contracts. Both these contracts (PX 17, 18) are for a period of twenty years and provide for certain program materials to be developed by Tanner and mailed from Tennessee to White River in Arkansas. Under the Air Play contract, White River was to pay Tanner $78.00 per month. The Advertiser contract provided for a payment of $100.00 per month. Under both contracts, White River was also obligated to give Tanner, on request, a certain number of spots, that is, one-minute periods of radio time in which Tanner could run any advertisement that it might be able to sell. Under the contracts, Tanner could ask for these spots at any time during the twenty-year period, but its request for spots was subject to approval by White River, which approval, however, could not be unreasonably withheld.

Mr. Savereide testified, and the Court finds, that he believed Mr. Henderson had the authority to execute these contracts on behalf of White River. He knew Mr. Henderson to be station manager, and, on his first visit to the station, sometime before, Mr. Higginbottom, who was "the supreme being of the station" (Savereide Dep. 7), had introduced him to Mr. Henderson as the station manager, and as the person with whom to deal in respect of programming contracts. (e. g., id. at 69). In addition, Mr. Savereide knew that the ownership transfer would shortly take place, having been approved by the FCC. He also knew that Mr. Henderson had de facto taken over direction of the station from Mr. Higginbottom. Mr. Henderson had moved into the "big office" that Mr. Higginbottom had formerly occupied, and "was in the big chair" (Savereide Dep. 55). Neither Mr. Higginbottom nor anyone else had ever given Mr. Savereide notice of any limitation on Mr. Henderson's authority.

The third contract in suit was signed by Mr. Savereide's next trip to Batesville, on March 19, 1976. This contract was for the "Tanner Total Sound Service," and called for payments of $80.00 a month, also for a twenty-year period. The Total Sound contract superseded the Credit Sales Service contract that had been in force since 1969. On this trip, Mr. Henderson still appeared to be in charge of the station. He was in the same "big office," and was still station manager, so far as Mr. Savereide knew. In fact, Mr. Henderson's titles and responsibilities had expanded somewhat. The transfer of ownership had been consummated, and Mr. Henderson had been elected President and General Manager. He had also, on January 6, 1976, been re-elected to the Board of Directors (PX 10). Under the bylaws adopted on January 9, 1976 (PX 11), and signed by Mr. Henderson as Chairman of the Board, "[t]he president shall be the chief executive officer of the corporation . . . [and] shall have general and active management of the business and affairs of the corporation" (Art. 5.06). The other two new owners of the stock in White River, Thomas G. Vinson and Thomas Andrew Vinson, had also been elected to the Board of Directors.

All three contracts had a typewritten clause added at the bottom, near the parties' signatures, to the effect that KBTA could switch to other available Tanner services at the end of any five-year period. All of the typewritten material was placed on the contracts before Mr. Henderson signed them. In addition, at the time the Total Sound contract was executed in March of 1976, Tanner granted to White River, as a bonus, the so-called Prestige Plan Station Identification License, entitling White River to forty-five station identification recordings at no additional charge.

White River began paying for the three contracts shortly after they were signed, and Tanner performed its part of the bargain. Under the Prestige Plan Agreement, for example, Tanner produced twenty-five vocal productions under the title "Simple and Free" and mailed them to White River on May 11, 1976. There is no evidence to rebut the customary presumption of receipt, and the Court finds that these twenty-five "cuts" were received by KBTA. From time to time White River fell behind in its monthly payments, and on July 23, 1976, Tanner, in response to a request from Mr. Henderson, sent a notice of amounts due directly to Thomas A. Vinson, who was in charge of writing checks (DX 2). Mr. Vinson received ledger cards pertaining to each of the three contracts. Shortly thereafter, payments were again brought current.

On March 23, 1977, Mr. Henderson resigned and left the station. Before that time, however, Vernon White, who had been chief engineer of KBTA since 1972 and sales manager since 1976, had inquired of Tanner about the three contracts, and had, on or about February 24, 1977, been sent copies of all three of them (PX 23). The station continued to receive materials under the contracts and to make payments all through 1977. In fact, on March 25, 1977, Thomas A. Vinson called Tanner to make sure that White River was given proper credit for its payments on the Air Play contract (DX 2).

White River has made some use of materials under all three contracts, and is still using, even after the filing of suit, materials furnished under the Total Sound contract. The station has also run all of the relatively small number of spots that Tanner has requested it to run under the contracts.

White River filed this suit for declaratory judgment on December 9, 1977, claiming, as indicated above, that it was not bound by the contracts because Mr. Henderson lacked authority to sign them. White River's last payment directly to Tanner on the Total Sound contract was made on December 31, 1977. Its last payment on The Advertiser contract was made on October 4, 1977, and its last payment on the Air Play contract was made on September 22, 1977. Since the filing of the suit, however, White River has paid into the registry of the Court, from time to time, amounts due under all three contracts, and stated at trial that, if the

Court should find the contracts binding, it would continue to make payments in accordance with their terms.

The first legal issue to be decided is the applicability of the Wingo Act, Ark.Stat. Ann. § 64–1202. White River points out that Tanner has never qualified to do business in Arkansas, and therefore contends that this Court may not entertain an action by Tanner to enforce these contracts. This contention must be rejected. It may be doubted, to begin with, whether White River has standing to invoke the statute. This litigation was initiated by White River, not by Tanner. It was White River that invoked the jurisdiction of the Arkansas state courts to determine the validity of these contracts. Thus, it may have waived whatever rights it may have to insist on compliance with the Wingo Act.

█ In any event, the statute does not apply to these contracts, since each of them provided, in substance: "This agreement is subject to TANNER's home office approval and STATION will be notified in writing if TANNER's home office approval is not given within thirty days. The situs of this contract is Memphis, Tennessee." The last act necessary to make the contracts binding, therefore, occurred in Tennessee, when the thirty-day period expired without Tanner's having exercised its right of disapproval. Tanner's home office is in Tennessee, and it was at the home office that the decision to approve or disapprove such contracts was made. *Brown Broadcast, Inc. v. Pepper Sound Studio, Inc.*, 242 Ark. 701, 416 S.W.2d 284 (1967), an action by the corporate predecessor of Tanner against the licensee of radio station KVEE in Conway, Arkansas, is almost directly in point. It is true that in *Pepper* the contracts were actually signed in Memphis, while these contracts were signed in Batesville, Arkansas. The opinion of the Supreme Court in *Pepper* emphasizes also, however, that the contracts in suit there were accepted by Pepper at its home office in Memphis, and it is this Court's view that the Supreme Court of Arkansas, on the authority of *Pepper*, would not apply the Wingo Act to these

contracts. See *Rose Mobile Homes, Inc. v. Rex Financial Corp.*, 383 F.Supp. 937, 944–45 (W.D.Ark.1974) (Miller, J.). In addition, these contracts clearly involve interstate commerce, to which the Wingo Act cannot constitutionally be applied. *Id.* at 946–47; *Goode v. Universal Plastics, Inc.*, 247 Ark. 442, 445 S.W.2d 893 (1969). The materials here were to be produced in Tennessee and mailed across state lines to Batesville, where they were to be used in a business heavily regulated by the Federal Communications Act. Under these circumstances, the Court holds that Tanner's counterclaim for enforcement of the contracts is not barred by Ark.Stat.Ann. § 64–1202. The statute should be construed to avoid constitutional doubts.

█ What, then, of the argument that Mr. Henderson lacked authority? Witnesses for White River insist that its principals had no knowledge of these contracts at the time they were executed. Mr. Henderson testified that they did have knowledge and that they failed to object. It is unnecessary for the Court to resolve this conflict as to Mr. Henderson's actual authority. The Court finds that Tanner's agent, Mr. Savereide, reasonably believed, because of White River's words and conduct, that the corporation consented to Mr. Henderson's signing this kind of agreement. The evidence detailed above will not be repeated. It is sufficient to recall that Mr. Savereide was initially referred to Mr. Henderson as the person with whom to deal, that Mr. Henderson was station manager and in charge of broadcasting operations generally and procurement of program materials in particular, and that, on December 18, 1975, Mr. Henderson had received FCC authority to become one of the new owners of stock in White River. The situation in March of 1976 is, if anything, stronger, because by then Mr. Henderson had actually been elected president and had received the title general manager.

White River argues that a twenty-year contract is extraordinary, but Mr. Savereide testified, and the Court finds, that such contracts, though not so common as agree-

ments of shorter duration, occurred with reasonable frequency in Tanner's business. The execution of such a long-term agreement could well be in a station's interest, since it would receive protection against rate increases over the life of the contract. In addition, even if Mr. Henderson lacked both actual and apparent authority to deal with Tanner, White River's subsequent acts ratified all three contracts. It is undisputed that White River, through Vernon White, its chief engineer and sales manager, had actual knowledge of all of the terms of the contracts no later than February 24, 1977. Yet, payments under the contracts continued for ten months thereafter, and White River continued to use at least some of the materials that Tanner was sending it. Acquiescence in the contracts that Mr. Henderson had negotiated with full knowledge of their terms amounts to approval and ratification of his actions.

Compare *William B. Tanner Co. v. WIOO, Inc.*, 528 F.2d 262, 266–68 (3d Cir. 1975). There, the Court of Appeals affirmed a holding of apparent authority in part because the agent involved bore the title "general manager". Although Mr. Henderson did not have this title when the first two contracts were executed, he had been pointed out to Mr. Savereide by a corporate officer of undoubted authority as the person with whom to deal.

Thus, Tanner is entitled to a judgment declaring that these three contracts are valid and binding on White River. It claims, in addition, that White River's filing suit is a repudiation of the contracts, amounting to a total breach entitling Tanner to recovery of damages based on the full value of White River's promised performance over the twenty-year periods. On this point, compare *William B. Tanner Co. v. Cameron Radio, Inc.*, 617 F.2d 169, 8th Cir., 1980 (discussing the Missouri law of anticipatory breach); *William B. Tanner Co. v. WIOO, Inc., supra*, 528 F.2d at 268–71 (Pennsylvania law).[1]

This Court does not agree that the bringing of suit for declaratory judgment is such a repudiation as will justify the bringing of an action for breach of the entire contract.[2] White River has expressly stated on the record that it will abide by the contract if this Court holds that Mr. Henderson had authority. The filing of suit for declaratory judgment, especially where, as here, it is accompanied by the payment of sums claimed into the registry of the Court, is not inconsistent with the contracts. It simply seeks a judicial determination of the contracts' validity. To treat the filing of suit as an anticipatory breach would discourage resort to courts for the resolution of uncertainties, and this Court declines to take such a step. *Cf. Georgia Power Co. v. Cimarron Coal Corp.*, 526 F.2d 101, 107–08 (6th Cir. 1975). It may be added that the Supreme Court of Arkansas has applied the doctrine of anticipatory breach, or renunciation, as it is sometimes called, rather sparingly. The doctrine does not apply, for example, to a contract to pay money at specified times. *Manufacturers' Furn. Co. v. Read*, 172 Ark. 642, 290 S.W. 353 (1927). Tanner is therefore entitled to recover for all installments up to the date of judgment.

This Court's holding that the contract is binding on White River obligates it, in accordance with its undertaking in open

---

1. This Court holds that the Supreme Court of Arkansas would apply Arkansas law to the question of anticipatory breach, as well as to the issue of apparent authority. Almost all of the events that are relevant to these two questions took place in Arkansas, where the contract was negotiated and where White River's promised performance was to take place. This choice of law may appear anomalous in view of the discussion above with respect to the Arkansas door-closing statute, under which, this Court believes, the Supreme Court of Arkansas would treat this contract as a Tennessee contract. The apparent anomaly may be explained by the severely penal nature of the door-closing statute. In any event, no one has suggested that Tennessee law would be any different on the issues of anticipatory breach and apparent authority.

2. Tanner relies also on White River's failure to make some payments on time. All payments were soon made current, however, thus showing that White River did not intend to repudiate the contracts.

Court, to make payments in the future, subject, of course, to White River's right to appeal, which is not waived. In other words, if this Court's judgment that the contract is binding becomes final, either here or on appeal, White River may not hereafter insist that it is not liable on the contract as to future installments. Tanner will therefore not be put to the difficulty of having to file successive actions for installments as they become due. As to White River's obligation to run spots under the contracts, it is worth remembering that it has never refused to run any spots requested by Tanner.

A word should be added as to White River's alternative claim for rescission or reformation. The claim, in brief, is that Mr. Savereide represented to Mr. Henderson that the three contracts would be cancellable after five years. Mr. Savereide denies that he made any such statement, and Mr. Henderson's testimony is equivocal on the point: he does not say that Mr. Savereide promised in so many words that the contracts would be cancellable after five years, but only that he left that "impression." In these circumstances, White River has not borne its burden of proving entitlement to rescission or reformation. The contracts must be enforced as written. The Court credits Mr. Savereide's testimony and finds that he clearly informed Mr. Henderson that after five years White River could switch to another Tanner service, and that he did not say that the contracts could be cancelled altogether.

Tanner is entitled to judgment declaring that the contracts are binding and awarding it the installments up through this month, April of 1980.

The amounts due are as follows: On the Total Sound contract, $2,140; on The Advertiser contract, $3,100; and on the Air Play contract, $2,418. The total due is $7,658. Of this amount, $7,500 has already been paid into the registry of the Court. Judgment will be entered directing the clerk to pay over this sum. Judgment will be entered for the remainder.