**CAMPEAU CORPORATION and Federated Department Stores, Inc., Plaintiffs,**

v.

**The MAY DEPARTMENT STORES COMPANY, Defendant.**

**No. 89 Civ. 2690 (CSH).**

United States District Court,
S.D. New York.

Oct. 24, 1989.

Cravath, Swaine & Moore, New York City, for plaintiffs; Ronald S. Rolfe, Alden L. Atkins and Bernardo Burstein, of counsel.

Sullivan & Cromwell, New York City, for defendant; D. Stuart Meiklejohn, Patricia A. Connell and S. Arieh Zak, of counsel.

HAIGHT, District Judge:

Plaintiffs Campeau Corporation and Federated Department Stores, Inc. (hereinafter collectively "Campeau") bring this action for a declaratory judgment, based upon diversity of citizenship, against defendant The May Department Stores Company ("May"). Campeau seeks judicial construction of a contract with May pursuant to which the latter agreed to purchase certain assets from Campeau. May now moves to stay the action pending arbitration, on the ground that the parties agreed to arbitrate those issues which underlie the action.

## BACKGROUND

In January 1988 Campeau announced an unsolicited tender offer for all the outstanding shares of Federated Department Stores, Inc. ("Federated"). Prior to the conclusion of the tender offer, Campeau and May entered into a letter agreement dated March 4, 1988 in which Campeau agreed to sell to May the Filene's and Foley's department store divisions of Federated in the event that Campeau acquired Federated. Campeau's tender offer for Federated was concluded successfully on May 3, 1988, and the sale of Filene's and Foley's closed on that same day, effective as of April 30, 1988.

The letter agreement provided a method for determining the final purchase price May was to pay for the Filene's and Foley's divisions. That method is described in Schedule II to the letter agreement, captioned: "Pricing Formula". While May purchased both divisions on a "as is, where is basis" the pricing method for each division was different. Schedule II to the letter agreement provided that the purchase price would be based upon a multiple of earnings before interest and taxes for Filene's, and a percentage of net sales for Foley's. As to both divisions, the parties further agreed that the purchase price would be adjusted based upon changes in working capital between the end of fiscal year 1987 (January 30, 1988) and the date of the closing. The provisions for working capital adjustments were intended to compensate the parties for changes in the eco-

nomic value of each division between fiscal year-end 1987 and the closing date. Schedule II to the letter agreement provided that any changes in working capital would be measured using Federated's accounting policies and past practices "as consistently applied." At the time of the closing, the parties estimated the change in working capital of each division, adjusted the purchase price accordingly, and May paid approximately $1.5 billion to Federated for the Filene's and the Foley's divisions.

After the closing date, each party proposed adjustments to the purchase price pursuant to procedures described in Schedule II. Each side disputes the adjustments proposed by the other. In Campeau's view, May is attempting to reduce the purchase price improperly through unwarranted adjustments. In May's view Campeau is attempting to increase the purchase price improperly through unwarranted adjustments.

The parties resolved some but not all of their differences through negotiations. Campeau now seeks a judicial declaration that its constructions of the Schedule II pricing formula are correct and May's are incorrect. In its present motion May contends that the parties agreed to arbitrate those issues.

The letter agreement provides in ¶ 10: (a) The parties hereto agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereto, this being in addition to any other remedy to which they are entitled at law or in equity. Each of the parties hereto hereby irrevocably agrees that any action or proceeding against it seeking specific performance or other equitable relief or other remedy arising out of this Agreement or any of the transactions contemplated hereby, except as provided in the last paragraph of Schedule II hereto, shall be brought only in the Supreme Court of the State of New York in and for the County of New York or the United States District Court for the Southern District of New York (or, in such courts do not have subject matter jurisdiction over such dispute, in any other state or Federal court located in the State of New York), preserving, however, all rights of removal to a Federal court under 28 U.S.C. § 1441.

The last paragraph of Schedule II reads: Any dispute regarding calculations under this Schedule II shall be resolved by an independent accounting firm of nationally recognized standing selected by the auditors of May and Campeau, respectively; the determination of the independent accounting firm so selected shall be made promptly and its findings shall be conclusive. May and Campeau shall share equally any expenses of such independent accounting firm. Any party may request any item on this Schedule II to be audited, in which event such audit will be made by such independent accounting firm whose fees and expenses shall be shared equally by May and Campeau.

The case turns upon whether or not the parties' agreement that "[a]ny dispute regarding calculations under this Schedule II shall be resolved by an independent accounting firm" covers the disputes which Campeau seeks to resolve by judicial declaration in this action.

### DISCUSSION

■ May bases its motion to stay this action upon the Federal Arbitration Act, 9 U.S.C. § 3, whose provisions appear in the margin.[1] Entitlement to a stay depends

---

**1.** 9 U.S.C. § 3 provides:

If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action

upon a showing that the opposing party has commenced suit "upon any issue referable to arbitration under an agreement in writing for such arbitration ..." If that showing is made, a stay is mandatory.

■ The statutory requirement that the parties agree in writing to arbitrate the issues in questions reflects the truth that "[d]ispute resolution by arbitration is and must be consensual." *Continental Group v. NPS Communications, Inc.*, 873 F.2d 613, 617 (2d Cir.1989). A party cannot be required to submit a dispute to arbitration unless he has agreed in writing to do so, *McAllister Bros. v. A & S Transportation Co.*, 621 F.2d 519, 522 (2d Cir.1980). At the same time, the Federal Arbitration act "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). More recently the Court, citing *Moses H. Cone*, said: "Thus, as with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability." *Mitsubishi v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 626, 105 S.Ct. 3346, 3354, 87 L.Ed.2d 444 (1985).[2]

■ While both Campeau and May cite a number of cases, the question is fact-oriented and precedent of relatively little value. Campeau focuses upon the single word "calculations" in the Schedule II arbitration agreement. It gives that word a narrow construction, characterizes the action at bar as one for "contract interpretation" (brief at 5), and argues that this is a

function for the court, not an arbitrator. May stresses the entire provision: "Any dispute regarding calculations under this Schedule II shall be resolved by an independent accounting firm of nationally recognized standing selected by the auditors of May and Campeau respectively ..."

Campeau's reading is artificially narrow and frustrates the parties' contractual intent, which must be gleaned from all of Schedule II and the letter agreement of which it forms a part. The issues between the parties relate to the proper adjustments to be made in respect of the Filene's and Foley's divisions working capital. Central to the process is an understanding and application of Federated's accounting policies and practices prior to the purchase. Thus in its opening paragraphs, containing definitions, Schedule II provides:

> "Working Capital" means, in relation to a Company Division, current assets reduced by current liabilities of such Company Division in each case *calculated on the same basis as the Company's reported financial statements consistent with the Company's accounting policies and past practices as consistently applied,* excluding (a) Federal, state and local income taxes and franchise taxes, (b) any current portion of any long term debts of the Company if not separately deducted from the Purchase Price of the Division, (c) any current portion of obligations under capitalized leases if not separately deducted from the Purchase Price of the Division, and (d) *items* pro-rated at the Division Closing. (emphasis added).

The various financial statements which Schedule II obligated one party or the other to furnish at the time of closing or thereafter were all keyed to "Federated's Accounting Policies and Past Practices con-

---

until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

**2.** Campeau does not question the applicability of the Federal Arbitration Act. While the letter of agreement provides that it shall be deemed a contract made under New York State law "and for all purposes shall be governed by, and con-

strued in accordance with, the laws of such State applicable to contracts to be made and performed entirely within such State", ¶ 10(b), ¶ 10(a) contains a consent to jurisdiction in this Court as well as the state court; and in any event the guiding principles of arbitrability are the same. *Continental Group v. NPS Communications, Inc., supra,* at 617.

sistently applied." Complaint ¶ 20. The *leitmotif* which runs through Campeau's specifications of May's errors (complaint, ¶¶ 26, 27) is that Campeau's adjustment to working capital consistently apply Federated's accounting policies and past practices, whereas May's adjustments fail to do so. In ¶ 26 of its complaint Campeau alleges six areas of improper adjustments by May. The following allegations are typical:

(b) May wrongfully refuses to apply consistently Federated Accounting Policies and Past Practices, which call for interim reporting as of April 30 of each year. By applying yearend, rather than interim, procedures to determine the Closing Date (April 30) Working Capital, May wrongfully asserts that the following items should be adjusted in the Closing Date (April 30) Working Capital: Last–In First–Out inventory reserves, accrued sales returns, accrued employee vacation, prepaid insurance and prepaid donations. May's asserted adjustments would reduce the Closing Date (April 30) Working Capital and reduce the Purchase Price.

(c) May wrongfully refuses to apply consistently Federated Accounting Policies and Past Practices to reconcile the valuation of Filene's and Foley's physical inventory with the accounting and book inventory records of those divisions to determine the Closing Date (April 30) Working Capital. Under Federated Accounting Policies and Past Practices, potential unrecorded liabilities for inventory purchases are identified solely by using Federated's own records evidencing receipt of inventory. However, May contacted outside sources to identify potential unrecorded liabilities, without regard for whether Federated had records evidencing the receipt of inventory. By deviating from Federated's Accounting Policies and Past Practices, May has identified phantom "liabilities" for the purchase of inventory that would reduce the Closing Date (January 30) Working Capital and reduce the Purchase Price.

In ¶ 27 Campeau alleges three areas of its own adjustments which May has improperly failed to accept. The first allegation in typical:

(a) May wrongfully refuses to accept adjustments to Campeau's Statements of Year–End (January 30) Working Capital that are consistent with Federated Accounting Policies and Past Practices and that must be made in order to ensure that the Year–End (January 30) and Closing Date (April 30) Working Capital are measured on a consistent basis. Those disputed adjustments are for accruals for computer services provided by Federated's data processing unit (SABRE) to Foley's, accounts payable invoices for Foley's construction in progress, an audit adjustment for a misposted accounting entry, accrued utility expenses for Foley's, receivables from vendors for construction allowances for Foley's and writing off Foley's aged other receivables. May's proposed inconsistent treatment of those items in the Year–End (January 30) and Closing Date (April 30) Working Capital statements would reduce the Working Capital Adjustment and reduce the Purchase Price.

These issues involve complex and technical accounting questions. They are far more appropriate for resolution by "an independent accounting firm of nationally recognized standing," as referred to in the arbitration clause, rather than by a trial judge, however well-intentioned. The question, of course, is not who could best resolve the issue, but whether the parties agreed in their contract that an arbitrator with appropriate expertise should do so. But I conclude without difficulty that it would do violence to the parties' contractual intent to characterize the issues pleaded in the complaint as non-arbitrable. Campeau's narrowing of the meaning of "calculations" to one of mathematics, which even a district judge with a calculator might be able to perform, wrenches the word out of its Schedule II context. Evaluation of the parties' Schedule II calculations requires meticulous examination by experts into whether or not the parties departed from Federated's past accounting policies and practices. Under any reasonable reading of the arbitration agreement, the parties

agreed upon resolution of such issues by an expert independent account.

In reaching that conclusion I need not rely upon the Supreme Court's direction in *Mitsubishi, supra,* that contractual language is to be read in a manner which favors arbitration. The language at bar seems plain enough even without such guidelines; in any event, *Mitsubishi* and the federal policy of which that case is an exemplar reinforce the conclusion of arbitrability in this case.

Accordingly I grant defendant's motion for a stay of these proceedings pending arbitration. The parties are directed to proceed forthwith to arbitration in the manner specified in the Agreement.

This Court will retain jurisdiction of the case for any such post-award motions as either party may be advised to make. In the interim, the Clerk is directed to place the case on the Suspense calendar.

It is SO ORDERED.