PERCEPTICS CORPORATION, Plaintiff,

v.

SOCIETE ELECTRONIQUE ET SYSTEMES TRINDEL, Defendant.

No. Civ. 3–91–0316.

United States District Court, E.D. Tennessee.

Sept. 30, 1992.

Kelli L. Thompson and Robert L. Crossley, Baker, Worthington, Crossley, Stansberry & Woolf, Knoxville, TN, for plaintiff.

John A. Lucas, Hunton & Williams, Knoxville, TN and Thomas D. Perrie, Perrie, Buker, Stagg & McCord, Atlanta, GA, for defendant.

## MEMORANDUM OPINION

JORDAN, District Judge.

This civil action is before the court for consideration of the motion to dismiss [doc. 3] filed by the defendant, called "Elsydel" for short. The motion raises issues of arbitrability and *forum non conveniens* in the context of an international commercial dispute.

Some understanding of the plaintiff's cause of action is necessary to an adjudication of the pending motion. The plaintiff Perceptics is a Tennessee corporation with its principal place of business in Knoxville. Elsydel is a corporation organized under the laws of the French Republic, and has its principal place of business in Paris. Elsydel designs and manufactures toll and access control systems. For example, an Elsydel system might be used to restrict access to parking lots to automobiles for which access fees have been paid.

Elsydel and Perceptics entered into an agreement under which Perceptics was to develop and to supply for incorporation into Elsydel's toll and access control systems license plate reading (LPR) technology. Perceptics' product, had all gone well, would have consisted, at least during the first stage of the parties' planned relationship, of a dedicated computer board and software. The agreement also contemplated ongoing cooperation in research, development, training and marketing.

According to the allegations in Perceptics' complaint, representatives of Elsydel visited Knoxville to negotiate this agreement. Elsydel first signed, in France, the resulting written agreement, and then sent it to Tennessee, where Perceptics signed it. The agreement is in English.

Also according to the allegations in Perceptics' complaint, this agreement contemplated a five-year relationship under which Perceptics would work on its LPR technology while Elsydel would work on marketing the toll and access control systems in the United States and Europe. The agreement required Elsydel to fund Perceptics' LPR research and development to the extent of at least $250,000.00. Also, the agreement required Elsydel to purchase from Perceptics minimum amounts, measured in United States dollars, of goods and services. The amounts of these minimum purchases changed from year to year during the life of the agreement, and, in any year in which Elsydel failed to purchase the required minimum, the agreement imposed a license fee on the French corporation.

Perceptics says that Elsydel breached the parties' agreement, by never funding the LPR research and development, and by purchasing only about $50,000.00 worth of goods and services during the first year of their contractual relationship, when, according to the agreement, Elsydel should have purchased goods and services worth at least five times that amount. Perceptics perceived Elsydel's breach as a repudiation of the parties' agreement, and so commenced this lawsuit.

I

Elsydel makes two arguments why the court should dismiss this lawsuit. The first

is that the parties agreed to arbitrate, and the second is that Tennessee does not provide a convenient forum. Concerning the arbitrability of the parties' dispute, Elsydel points to article 24 on page 15 of the parties' written agreement, under the heading "CONTROLLING LAW"[1]:

> This agreement is made, entered into, executed and delivered between international corporations and, as such, shall be governed, controlled, interpreted and defined by and under the rules and the jurisdiction of the International Chamber of Commerce, entirely independent of the forum in which this agreement or any part thereof may come up for construction, interpretation or enforcement.[2]

In support of its argument in favor of arbitrability, Elsydel submitted with its reply memorandum [doc. 7] the affidavit of one of its officers, Claude Verrier, in which Mr. Verrier describes the negotiations which led to the inclusion of article 24 in the parties' written agreement. However, as counsel for Elsydel conceded at oral argument on his client's motion, Mr. Verrier confused the agreement in issue with another written agreement between the same parties, with the result that paragraphs 3, 4 and 5 of his affidavit must be treated as having been withdrawn.

Setting aside these withdrawn paragraphs, it appears that Perceptics first proposed as article 24 of the agreement in issue a choice of law provision which made Tennessee law the governing law. Elsydel objected to this. Notes prepared by Perceptics after a May, 1988 meeting between the parties to discuss the agreement indicate that Elsydel wanted a provision such as "Any disagreements will be discussed and negotiated until resolved, with the International Chamber of Commerce being the governing body." The Perceptics employee who sent a copy of these meeting notes to Elsydel wrote in his cover letter, "I must emphasize that these meeting notes do not imply agreement for either Elsydel or Perceptics. I have tried to emphasize the Elsydel perspective."

After Perceptics sent this letter to Elsydel, Perceptics prepared the next draft of the agreement, in which article 24 appears under the same heading and in the same language as in the final written agreement, with one exception: the agreement is stated in this draft to be governed, controlled, interpreted and defined "by and under the jurisdiction of the International Chamber of Commerce," whereas the language in the final, signed draft refers to "*the rules and* the jurisdiction of the International Chamber of Commerce". (Emphasis added.) This addition was made at the request of Elsydel.

Perceptics, in support of its response [doc. 9] to Elsydel's reply concerning the pending motion, submitted the affidavit of its president, R.C. Gonzalez. Mr. Gonzalez does not dispute Mr. Verrier's version (without the withdrawn paragraphs) of the evolution of article 24, but says that he did not understand this provision to be an agreement to arbitrate. Mr. Gonzalez states in his affidavit that Elsydel requested that the original choice of law provision be modified to refer to the International Chamber of Commerce instead of to Tennessee, and that

> Elsydel did not demand that any disputes be submitted to arbitration. There were no discussions as to what effect this change would have, nor did any of the people at that meeting discuss arbitration; that was the extent of the discussions regarding Article 24 at the meeting. Later, Mr. Malbrunot [of Elsydel] did request in writing that the provision be modified to refer to the rules of the ICC.

> After the negotiation of the Agreement, I did not believe that Perceptics had agreed to submit any disputes to arbitration nor

---

1. The written agreement does not contain a choice of law provision.

2. The standard English-language version of an agreement to arbitrate recommended by the International Chamber of Commerce in its publication no. 447, ICC RULES OF CONCILIATION AND ARBITRATION (2d ed. 1990), reads,

> All disputes arising in connection with the present contract shall be finally settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said Rules.

did Perceptics intend to agree to arbitration under § 24 of the Agreement.

Perceptics also submitted the affidavit of its vice-president, R.E. Woods, who points out that Perceptics and Elsydel, in a previous written agreement, included an express agreement to arbitrate:

**Article 5—Arbitration**

In the eventuality of the parties not to be able to find an amiable agreement on any dispute, the International Chamber of Commerce will be the sole competent for arbitration.

(It is this earlier agreement to which Mr. Verrier mistakenly had reference in paragraphs 3, 4 and 5 of his affidavit filed in this civil action.) Perceptics' argument is that the parties knew how to make a written agreement to arbitrate when they wanted one, and that the language in dispute is not such an agreement.

## II

The arbitrability issue presented is whether article 24 of the parties' written agreement is a "written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy arising out of such contract or transaction, or the refusal to perform the whole or any part thereof" under 9 U.S.C. § 2. There cannot be any doubt in this case, and the parties do not dispute the fact, that their written agreement is a "contract evidencing a transaction involving commerce". 9 U.S.C. § 1. *See Scherk v. Alberto–Culver Company,* 417 U.S. 506, 511 n. 5, 94 S.Ct. 2449, 2453 n. 5, 41 L.Ed.2d 270 (1974).

■ This being the case, the issue is governed by federal law concerning arbitration, regardless of whether Tennessee or French law governs the parties' agreement generally. *See Georgia Power Company v. Cimarron Coal Corporation,* 526 F.2d 101, 107 (6th Cir.1975), *cert. denied,* 425 U.S. 952, 96 S.Ct. 1727, 48 L.Ed.2d 195 (1976) (citation omitted). "[T]here is a strong federal policy in favor of arbitration." *Id.* Moreover, "[t]he policy in favor of arbitration is even stronger in the context of international business transactions." *David L. Threlkeld & Co., Inc. v.*

*Metallgesellschaft Limited (London),* 923 F.2d 245, 248 (2d Cir.), *cert. dismissed,* 501 U.S. 1267 [112 S.Ct. 17, 115 L.Ed.2d 1094] (1991), *citing Mitsubishi Motors Corporation v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985), and *Scherk v. Alberto–Culver Company,* 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974). This strong policy is shown by the United States' participation in The Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, enforced in this nation by 9 U.S.C. §§ 201, *et seq.*

■ An obligation to arbitrate can arise only from an agreement to do so, and "[t]he intention of the [contracting] parties must be determined from [their] entire agreement." *Georgia Power Company, supra,* 526 F.2d at 106 (citation omitted). However, "as with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability." *Mitsubishi Motors Corporation, supra,* 473 U.S. at 626, 105 S.Ct. at 3354.

■ No particular language is required to evidence an agreement to arbitrate. In *Campeau Corporation v. May Department Stores Company,* 723 F.Supp. 224 (S.D.N.Y. 1989), the district court found an agreement to arbitrate in language in a schedule attached to an agreement for the sale of corporate assets which provided for a purchase price adjusted to the date of closing, and which also provided that any dispute concerning calculations made under the pricing formula would be resolved conclusively "by an independent accounting firm of nationally recognized standing" selected by the parties' auditors. In *Sumaza v. Cooperative Association,* 297 F.Supp. 345 (D.P.R.1969), a clause which read "Eventually arising differences are to be settled with a perfect and mutual understanding. Place of arbitration will be Esbjerg, Denmark" was held to be an unlimited agreement to arbitrate differences which might arise under the contract which included the clause.

## III

■ Applying these principles in the case at bar, the court must conclude as a matter

of law that these parties' written agreement includes an agreement to arbitrate differences arising under the agreement, such as those presented in Perceptics' lawsuit. It bears repeating that there is no dispute concerning the existence and enforceability of the parties' written agreement, a copy of which is attached to Perceptics' complaint filed in this civil action. The arbitrability question is, therefore, a matter of contract interpretation, which is a question of law for the court.

The problem encountered in trying to read article 24 as anything other than an agreement to arbitrate is that Perceptics' view would render the provision essentially meaningless. It is a "well accepted and basic principle that an interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless." *Fortec Constructors v. United States*, 760 F.2d 1288, 1292 (Fed.Cir.1985) (citation omitted).

The rules of the International Chamber of Commerce, by which the parties' agreement is stated in article 24 to be "governed, controlled, interpreted and defined", are rules for the conciliation and arbitration of commercial disputes. *David L. Threlkeld & Co., Inc. v. Metallgesellschaft Limited (London)*, *supra*, is instructive in this regard. In that case, confirmations and a standard customer contract on forms produced by a licensed "ring-dealing" member of the London Metal Exchange made the contracts between this ring-dealer and its customer, the plaintiff, subject to the rules and regulations of the London Metal Exchange, which in turn contained two arbitration provisions. The Court of Appeals for the Second Circuit held that these arbitration provisions also applied to the alleged oral, collateral agreement between these parties, under which the ring-dealer was to provide the plaintiff from time to time with accurate valuations of the forward contracts for copper and aluminum purchased by the ring-dealer for the plaintiff.

The insertion of the word "jurisdiction" in article 24, read with the reference to the chamber's rules, can only be understood as a conferral of jurisdiction on this arbitral forum. This in turn indicates that the last phrase, beginning with the words "entirely independent", means that the jurisdiction of the arbitral forum is not ousted by the commencement of any proceeding, such as this civil action, anywhere else in the world.

Counsel for Perceptics, at oral argument on Elsydel's motion, stated that amateur draftsmanship had made article 24 a "black hole" of meaning. However, that is true only if one searches for a meaning other than the simple one advocated by Elsydel. The court concludes as a matter of law that these parties agreed to arbitrate. Under familiar principles of contract law, Mr. Gonzalez' affidavit evidence of his subjective understanding of article 24 cannot overthrow the construction derived from the language of the article itself, read in the context of the entire agreement. *See, e.g., Tennessee Valley Authority v. Exxon Nuclear Company, Inc.*, 753 F.2d 493, 496 (6th Cir.1985) (citation omitted).

## IV

■ In light of the fact that the court finds that the intent of these parties expressed in their written agreement, construed in accordance with federal substantive law concerning arbitration, resulted in an agreement to arbitrate, there is no justification for an evidentiary hearing under 9 U.S.C. § 4 in this case. This is not a case in which the making of the arbitration agreement is in issue as the term is used in the statute, but is instead a case in which the court must construe the meaning of the parties' agreement, which the parties agree that they signed. This distinguishes the case at bar from, for example, *Interocean Shipping Company v. National Shipping and Trading Corporation*, 462 F.2d 673 (2d Cir.1972), *on subsequent appeal*, 523 F.2d 527 (1975), *cert. denied*, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976), in which there was a genuine issue whether the parties' minds had met to form the alleged charter party which contained the arbitration clause sought to be enforced. *Cf. Manning v. Energy Conversion Devices, Inc.*, 833 F.2d 1096, 1103 (2d Cir.1987) (citations omitted) (to invoke the 9 U.S.C. § 4 provision for a trial, the party resisting arbitration on the ground that there was no agreement to arbitrate "must submit

1144

sufficient evidentiary facts in support of this claim").

The court will therefore, in accordance with 9 U.S.C. § 3, stay proceedings in this action "until ... arbitration has been had in accordance with the terms of the [parties'] agreement." Elsydel stated in its reply memorandum filed in this civil action [doc. 7] that it "agrees with Perceptics that if the Court orders arbitration, it can stay, rather than dismiss this suit." The court finds this to be the more judicious course, in light of the fact that consideration at this stage of the litigation of Elsydel's *forum non conveniens* argument might encroach upon the jurisdiction of the International Chamber of Commerce, or might decide an issue unnecessarily, depending on the outcome of the parties' arbitration of their dispute. Furthermore, if Perceptics obtains an award of some relief, circumstances existing at the time of the arbitrators' award, such as the presence of Elsydel or of some of its assets in the United States, might justify this court's exercise of jurisdiction to enforce the arbitral award, regardless of whether any judgment entered by this court would be enforceable in the French Republic.

For the reasons stated, the court will deny the defendant's motion to dismiss, but will stay all proceedings in this civil action pending the parties' arbitration of their dispute before the International Chamber of Commerce.

### ORDER

For the reasons stated in the court's memorandum opinion filed simultaneously with this order, the court finds the defendant's motion to dismiss [doc. 3] not well taken, and it is **DENIED.**

It is **ORDERED,** however, that all proceedings in this civil action are **STAYED** under 9 U.S.C. § 3 pending the parties' arbitration of their dispute before the International Chamber of Commerce.

The parties are **ORDERED** to report in writing the status of their arbitration proceedings, on or before April 1, 1993.