**BANGOR HYDRO–ELECTRIC CO., Plaintiff,**

v.

**NEW ENGLAND TELEPHONE AND TELEGRAPH CO., Defendant.**

No. Civ.A.99–62–B.

United States District Court,
D. Maine.

July 30, 1999.

James L. Costello, Curtis, Thaxter, Stevens, Broder & Micoleau, Bangor, Maine, William G. Schaffer, Curtis, Thaxter, Stevens, Broder, & Micoleau, Portland, Maine, for plaintiff.

Ernest J. Babcock, Friedman, Babcock & Gaythwaite, Portland, Maine, for defendant.

## ORDER AND MEMORANDUM OF DECISION

BRODY, District Judge.

Plaintiff Bangor Hydro–Electric Co. ("Plaintiff"), a Maine corporation, brings this diversity action against Defendant New England Telephone & Telegraph Co., d/b/a Bell Atlantic ("Defendant"), a New York corporation. Plaintiff alleges that Defendant was obligated to pay a certain portion of tree clearance costs incurred by Plaintiff during the January 1998 ice storm, and that Defendant failed to do so. Plaintiff seeks to recover approximately $295,675.00 under the theories of breach of contract (Count I), quantum meruit (Count

II), unjust enrichment (Count III), and equitable contribution (Count IV). Before the Court is Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and to Compel Arbitration pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16. For the reasons discussed below, the Court treats Defendant's Motion as a Motion to Stay and Compel Arbitration and the Motion is GRANTED.

## I. BACKGROUND

The sole issue presented at this stage of the proceedings is whether Plaintiff's claims are subject to arbitration. Consequently, the Court dispenses with a lengthy discussion of the facts bearing on the merits and focuses instead on the facts related to arbitrability.[1] The following information—drawn from Plaintiff's Complaint, from the Affidavit of Larry Billings[2], and from a copy of a letter from Larry Billings to George A. Belcher, Jr.[3] ("Billings Letter")—is sufficient to provide some context.

Plaintiff is an electric utility that provides electrical transmission and distribution services throughout the greater Bangor area and the surrounding counties, including Penobscot, Piscataquis, Hancock, Washington, and Waldo counties ("Service Territory"). Defendant is a telephone utility that provides telephone services throughout Maine, including the Service Territory. Both Plaintiff and Defendant provide their respective services to customers within the Service Territory via utility distribution poles. Approximately seventy percent of the utility poles used by Plaintiff in the Service Territory are owned jointly, in equal ownership interest, by Plaintiff and Defendant.

In 1984, the parties executed a written contract entitled the "Joint Pole Agreement" that governs their joint ownership and occupancy of the utility poles. Plaintiff asserts that the Joint Pole Agreement provides, among other things, that Plaintiff and Defendant will share equitably the expenses and benefits connected with the jointly owned and occupied poles.

Beginning on or about January 5, 1998, and continuing through January 9, 1998, the State of Maine suffered a series of catastrophic ice storms. The Service Territory was among the most severely damaged areas in the State. Accumulations of ice on utility poles, wires, and trees caused numerous utility poles to weaken and collapse. Trees, limbs, and lines fell on and around utility poles. As a result, electrical power and telephone services were affected or cut off throughout the State and, in particular, the Service Territory.

Starting on January 7, 1998, Plaintiff engaged and dispatched work crews ("Tree Clearance Crews") throughout the Service Territory to cut, trim, and clear away the trees, limbs, and debris that had fallen on and around utility poles and lines ("Tree Clearance Work"). As a result of deploying the Tree Clearance Crews, Plaintiff incurred costs totaling approximately $700,000.00 ("Tree Clearance Costs"). At some point during the next few months, Plaintiff indicated to Defen-

1. Defendant has attached a number of documents to its Motion to Dismiss and Compel, including a Statement of Undisputed Material Facts and the Affidavit of Steve Polyot. Both of these submissions speak to the merits of Plaintiff's claims. Although Defendant invites the Court to convert its Motion to Dismiss and Compel into a Motion for Summary Judgment "to the extent necessary," (Def.'s Mot. Dismiss and Compel at 2 n. 2.), such a conversion would be inappropriate because the issue before the Court is not dispositive of Plaintiff's substantive claims. The Court therefore will not consider Defendant's Statement of Undisputed Material Facts or the Affidavit of Steve Polyot.

2. This affidavit was attached to Plaintiff's Response to Defendant's Motion to Dismiss and Compel.

3. This document was appended to the Affidavit of George A. Belcher as Defendant's Exhibit A and attached to Defendant's Motion to Dismiss and Compel.

dant that it would bill Defendant for a portion of the Tree Clearance Costs.

In the spring of 1998, Defendant requested that Plaintiff provide a separate billing for its portion of the Tree Clearance Costs, rather than including those costs as an item in Plaintiff's routine monthly cross-billing with Defendant. In accordance with this request, Plaintiff submitted to Defendant in May a bill indicating its assessment of Defendant's share of the Tree Clearance Costs and describing the work performed, the hours worked, and the location of the work. The bill specified that Defendant pay approximately $295,-675.00 to Plaintiff. Defendant responded that it would not pay for any of the Tree Clearance Work.

On June 17, 1998, Larry Billings, Plaintiff's Manager of Transmission and Distribution, sent a letter to George A. Belcher, a specialist in Joint Lines Facility Management for Defendant, explaining Plaintiff's position as to the bill and asking "for your re-consideration in this matter and if you still feel that it isn't equitable then we must inform you that we will pursue this to the next step provided for in our agreement, that of 'arbitration' as provided for in 'Article XV.' " (Billings Letter at 1.) Defendant never responded to this comment in the Billings Letter. The two parties continued to correspond regarding the dispute between June 1998 and the winter months of 1998 with no further mention of arbitration. (Billings Aff. at 3; Def.'s Reply Pl.'s Resp. Mot. Dismiss and Compel at 6.)

On March 8, 1999, Plaintiff filed a Complaint in this court asserting that by refusing to pay the amount specified, Defendant has breached a contract (Count I) and is additionally liable under the theories of quantum meruit (Count II), unjust enrich-

ment (Count III), and equitable contribution (Count IV).

Defendant then filed a Motion to Dismiss for Lack of Subject Matter Jurisdiction and to Compel Arbitration based on Article XV of the Joint Pole Agreement, a copy of which is attached to the Affidavit of George A. Belcher as Defendant's Exhibit B. Article XV of the Joint Pole Agreement is entitled "Arbitration" and states in its entirety:

> In any case where it becomes necessary to resort to arbitration to resolve any provisions of this Agreement, each party shall designate an arbitrator and the two so selected shall have the right to appoint a third arbitrator. If they shall be unable to agree upon a third arbitrator, then the third arbitrator shall be appointed by a Justice of the Maine Supreme Judicial Court. Findings of fact by the arbitrators shall be binding and conclusive on the parties.

(Def.'s Ex. B.)

## II. DISCUSSION

■ Section 3 of the FAA provides for the stay of an action brought in federal court where that action involves an issue intended by the parties to be resolved through arbitration.[4] 9 U.S.C. § 3 (1994). Section 4 of the FAA provides for an order directing the parties to proceed to arbitration where they have agreed upon that dispute resolution method. 9 U.S.C. § 4 (1994). In order to grant a motion brought pursuant to these provisions, the Court must find that (i) there exists a written agreement to arbitrate, (ii) the dispute in question falls within the scope of that arbitration agreement, and (iii) the party seeking an arbitral forum has not waived its right to arbitration. *See Brennan v. King*, 139 F.3d 258, 263–67 (1st

4. Where the action is premised on diversity jurisdiction, as in this case, section 3 may be invoked only if the suit is grounded in a maritime transaction or a contract involving a transaction in interstate commerce. *See Bernhardt v. Polygraphic Co. of America,* 350

U.S. 198, 201–02, 76 S.Ct. 273, 100 L.Ed. 199 (1956). Since the parties did not address this requirement in their briefs, the Court will assume they agree that this case implicates a contract involving a transaction in interstate commerce.

Cir.1998). The Court will discuss each of these elements in turn.

### 1. Existence of an Arbitration Agreement

 The first and primary question before the Court in this case is whether the parties entered into an arbitration agreement at all. As the party seeking to substitute an arbitral forum for a judicial one, Defendant bears the burden of demonstrating, "at a bare minimum, that the protagonists have agreed to arbitrate some claims." *McCarthy v. Azure*, 22 F.3d 351, 355 (1st Cir.1994); *see also MCI Telecommunications Corp. v. Exalon Indus., Inc.*, 138 F.3d 426, 428–29 (1st Cir.1998) (observing arbitration is "strictly the product of voluntary contractual obligations"). Whether there is an obligation in the first place to arbitrate "is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (quoting *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)). Where the existence of an arbitration agreement is at issue, that question is to be decided with reference to state contract law principles. *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 170 F.3d 1, 19 (1st Cir.1999).

Article XV of the Joint Pole Agreement, entitled "Arbitration," provides:

> In any case where it becomes necessary to resort to arbitration to resolve any provisions of this Agreement, each party shall designate an arbitrator and the two so selected shall have the right to appoint a third arbitrator. If they shall be unable to agree upon a third arbitrator, then the third arbitrator shall be appointed by a Justice of the Maine Supreme Judicial Court. Findings of fact by the arbitrators shall be binding and conclusive on the parties.

(Def.'s Ex. B.) Both parties assert that Article XV is unambiguous, but disagree as to its import.[5] Defendant argues that the language of Article XV indicates that any disputes arising out of the Joint Pole Agreement are to be decided through arbitration.[6] Plaintiff contends, in contrast, that Article XV merely sets forth the procedures to be followed in selecting an arbitrator in the event the parties decide to utilize arbitration to resolve a dispute.

The language giving rise to these competing interpretations is: "[i]n any case where it becomes necessary to resort to arbitration." (Def.'s Ex. B.) According to Defendant, it is "necessary to resort to arbitration" when the parties cannot resolve a dispute arising out of the Joint Pole Agreement in the absence of third party intervention. Plaintiff's decision to file a Complaint in federal district court, argues Defendant, illustrates that this is an occasion where the parties are at an impasse and thus must "resort to arbitration." Plaintiff, on the other hand, insists that the language of this clause simply does not reflect an agreement to arbitrate disputes relating to the Joint Pole Agreement that cannot be resolved by the parties themselves.

---

**5.** In its Reply brief, Defendant additionally suggests that it will prevail even if the Court concludes that Article XV is ambiguous.

**6.** As additional support for its assertion that an arbitration agreement exists, Defendant reminds the Court of the federal policy generally favoring arbitration. Plaintiff correctly notes, however, that this policy applies only to the interpretation of the scope of an arbitration agreement, rather than to the question of whether such an agreement exists in the first

place. *See McCarthy v. Azure*, 22 F.3d 351, 355 (1st Cir.1994) ("[t]he federal policy presumes proof of a preexisting agreement to arbitrate disputes arising between the protagonists"); *PaineWebber, Inc. v. Landay*, 903 F.Supp. 193, 197 (D.Mass.1995) ("the presumption of resolving doubts in favor of arbitration should be applied in situations where the parties have a valid arbitration agreement in place at least for some issues").

■ The mere fact that the parties advance different interpretations of Article XV's language does not necessarily reflect the presence of an ambiguity that would permit consideration of extrinsic evidence. Under Maine law, whether a contract language is ambiguous is a question of law to be decided by the Court. *See Portland Valve, Inc. v. Rockwood Sys. Corp.*, 460 A.2d 1383, 1387 (Me.1983). "Contract language is ambiguous when it is *reasonably* susceptible of different interpretations." *Portland Valve, Inc.*, 460 A.2d at 1387 (emphasis added). In this case, the Court is persuaded that the language of Article XV is "reasonably susceptible of" only one interpretation—that advanced by Defendant—and therefore concludes that the clause is unambiguous.

Unquestionably, Article XV is an example of poor draftsmanship. Moreover, the Court is mindful that it "should not rewrite contracts, particularly agreements between two corporations acting at arms length." *Id.* at 1388. Nevertheless, courts in this Circuit have not required meticulously detailed language to support the existence of an arbitration agreement. *See Powderly v. MetraByte Corp.*, 866 F.Supp. 39, 42 (D.Mass.1994) ("The use of the term arbitrate is not a vital ingredient of an agreement to do so."); *Sumaza v. Cooperative Ass'n*, 297 F.Supp. 345, 347 (D.P.R.1969) ("An arbitration agreement ... need not follow a particular form or phraseology"). In *Sumaza*, the Court determined the existence of an agreement to arbitrate based on contract language stating only that "[e]ventually arising differences are to be settled with a perfect and mutual understanding. Place of arbitration will be Esbjerg, Denmark." *Sumaza*, 297 F.Supp. at 347. In a later case relying on *Sumaza*, the Eastern District of Tennessee found that the parties had agreed to arbitrate based solely on the language: "[i]n the eventuality of the parties not to be able [sic] to find an amiable agreement on any dispute, the International Chamber

of Commerce will be the sole competent for arbitration." *Perceptics Corp. v. Societe Electronique et Systemes Trindel*, 907 F.Supp. 1139, 1142–43 (E.D.Tenn. 1992). It rejected the defendant's argument that "the parties knew how to make a written agreement to arbitrate when they wanted one, and ... the language in dispute is not such an agreement" because such a position would render the provision "meaningless." *Perceptics Corp.*, 907 F.Supp. at 1142–43.

■ The interpretation of an unambiguous contract is a question of law and "must be determined from the plain meaning of the language used and from the four corners of the instrument without resort to extrinsic evidence." *Portland Valve, Inc.*, 460 A.2d at 1387. "A contract must be interpreted to effect the parties' intentions as reflected in the written instrument, construed with regard for the subject matter, motive, and purpose of the instrument, as well as the object to be accomplished." *Briggs v. Briggs*, 711 A.2d 1286, 1288 (Me. 1998). In this case, Article XV (i) bears the title "Arbitration," (ii) references the possibility that the parties may be unable to resolve disputes arising out of the "provisions of this Agreement" themselves, (iii) sets forth the mode by which an arbitrator is to be designated, and (iv) states that the arbitrator's factual conclusions will bind the parties. Notwithstanding these features, Plaintiff argues that Article XV is not an agreement to arbitrate. The Court disagrees. Article XV clearly contemplates that there will be instances in which the parties are unable to resolve disagreements related to the Joint Pole Agreement on their own, and that they will have to "resort" to another method of dispute resolution on such occasions. It identifies arbitration as that dispute resolution method. In light of this language, the Court is persuaded that in Article XV, the parties manifested their intent to channel any disputes arising out of the Joint Pole

Agreement to arbitration.[7]

## 2. Dispute Falling Within Scope of Arbitration Agreement

 Having determined that the parties agreed to arbitrate any disputes arising out of the Joint Pole Agreement, the Court now must evaluate whether the dispute in question falls within the scope of that arbitration agreement. Assessing the scope of an arbitration agreement in relation to a particular dispute is a matter of both state law and general federal substantive law. *See Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 170 F.3d 1, 19 (1st Cir.1999). It is at this point in the analysis that the federal presumption of arbitrability comes into play: "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Brennan v. King*, 139 F.3d 258, 264 (1st Cir.1998) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)).

Defendant identifies the relevant dispute as "whether joint tree trimming occurred justifying a division of costs, and occurred in accordance with the procedures outlined in the Agreement." (Def.'s Mot. Dismiss and Compel at 7–8.) It points to the Joint Operating Procedures, which are incorporated into the Joint Pole Agreement,[8] as the source of the parties' disagreement. Specifically, Defendant directs the Court to Section III, Article IV of the Joint Operating Procedures, entitled "Joint Trimming and Spraying," which provides that "[t]he following principles apply to joint tree trimming and spraying where such work is mutually agreed upon in advance," and which further provides that:

> Joint tree trimming associated with heavy storm work such as hurricanes and ice storms, when each Company deploys trimming crews, shall be coordinated by field representatives of each Company as soon as practical. Determination will be made as to the areas which each Company will deploy its crews and the order in which lines will be cleared.

(Def.'s Ex. B.) Defendant contends that since the dispute giving rise to Counts I–IV of Plaintiff's Complaint arises out of differing interpretations of a provision of the Joint Pole Agreement, it is one of the disputes the parties agreed to submit to arbitration and all four claims should be decided by an arbitrator.

Plaintiff does not contest that disputes relating to the "provisions" of the Joint Pole Agreement are subject to arbitration under Article XV. It argues, however, that since Counts II (quantum meruit), III (unjust enrichment), and IV (equitable contribution) of his Complaint do not specifically reference a "provision" of the Joint Pole Agreement, these claims are not subject to arbitration. Furthermore, although Plaintiff concedes that Count I (breach of contract) does reference a provision of the Joint Pole Agreement, it contends that even this count is not subject to arbitration for two reasons: (i) Count I is grounded in a different provision of the Joint Pole

---

7. As the Court has determined that Article XV is unambiguous and constitutes an agreement to arbitrate, it will not address Defendant's alternative argument that Plaintiff impliedly consented to arbitration, nor will it address the numerous arguments advanced by both parties as to the relevance of the Billings Letter.

8. Plaintiff suggests the Joint Operating Procedures are not so incorporated, and in fact constitute a separate agreement, but this claim is specious. The preamble of the Joint Pole Agreement clearly states "[w]hereas, this agreement is intended to set forth the basic terms of joint occupancy and work, the detailed administration and operations thereof being set forth in 'Joint Operating Procedures,' attached hereto and made a part hereof and administered by a Joint Occupancy Committee as hereinafter provided." (Def.'s Ex. B.)

Agreement than the one cited by Defendant in its Motion, and (ii) a dispute over the provisions of the Joint Pole Agreement could only arise as a defense to Count I, and no Answer asserting affirmative defenses has been filed.

With respect to Count I, Plaintiff's formalistic appeals are unavailing. Count I states that "[p]ursuant to the Joint Pole Agreement, [Defendant] agreed to share the expenses related to [the parties'] ownership and occupancy of the jointly owned poles in the Service Territory" and that "[Defendant] has breached the Joint Pole Agreement." (Pl.'s Compl. at 6.) This is a clear invocation of the Joint Pole Agreement as the source of Defendant's asserted obligation to pay. The fact that Defendant's Motion cites a provision other than the one apparently contemplated by Plaintiff, and the fact that Defendant has not filed an answer asserting an affirmative defense premised on a provision of the Joint Pole Agreement, are simply irrelevant in the face of the plain language of Count I.

■ With respect to Plaintiff's position that Counts II, III, and IV are non-arbitrable because they do not reference a specific provision of the Joint Pole Agreement, the Court observes that "the First Circuit has rejected the labeling of controversies arising out of or related to the contract subject to arbitration so as to exclude them from the scope of arbitration." *Sea–Land Serv., Inc. v. Sea–Land of P.R., Inc.,* 636 F.Supp. 750, 755 (D.P.R. 1986). These counts, like Count I, relate to whether Defendant is obligated to pay for any portion of the Tree Clearance Work. Analysis of these causes of action will require an inquiry into the reasonableness of Plaintiff's expectation that Defendant bear some of this expense. *See Smith v. Cannell,* 723 A.2d 876, 880 (Me. 1999) (quantum meruit); *Landry v. Landry,* 697 A.2d 843, 845 (Me.1997) (unjust enrichment); *Bragdon v. Worthley,* 155 Me. 284, 288–89, 153 A.2d 627 (Me.1959) (equitable contribution). This in turn will

be distilled, at least in part, by reference to the provisions of the Joint Pole Agreement, which governs the parties' joint ownership and occupancy of the utility poles. In light of the fact that these three claims significantly overlap with the breach of contract claim as far as the relevance of the Joint Pole Agreement, and in light of the federal policy favoring arbitrability, the Court concludes that Counts II, III, and IV, in addition to Count I, fall within the scope of the arbitration agreement.

**3. Waiver**

■ Plaintiff next argues that Defendant has waived any right it may have had to arbitration based on its conduct dating back to the earliest stages of this dispute. Section 3 of the FAA requires that "the applicant for the stay [not be] in default in proceeding with such arbitration." 9 U.S.C. § 3 (1994). In order to successfully assert waiver by the opposing party, a plaintiff must demonstrate that it has been prejudiced. *See Sevinor v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 807 F.2d 16, 18 (1st Cir.1986). The burden to prove waiver is a weighty one, particularly where the party seeking arbitration has not answered the complaint, as in this case, or otherwise "lock[ed] litigious horns." *Hilti, Inc. v. Oldach,* 392 F.2d 368, 371 (1st Cir.1968).

Resolution of the waiver issue requires this Court to sift through the conflicting narratives advanced by the parties as to their respective courses of conduct. Plaintiff claims that from the beginning, Defendant has delayed resolution of this dispute. It first characterizes Defendant's initial request in the spring of 1998 for a separate billing of its portion of the Tree Clearance Costs as irregular and suspect. It then argues that the Billings Letter was an "invitation to submit the dispute to arbitration" that was "ignored" by Defendant. (Pl.'s Resp. Def.'s Mot. Dismiss and Compel at 6.) Plaintiff more generally asserts that in the months after the exchange of the Billings Letter, it tried to negotiate the

dispute with Defendant, but Defendant resisted its attempts to reach a compromise, offering varying reasons for its refusal to pay the bill.

Defendant, in contrast, frames Plaintiff's Complaint as having "interrupted a lengthy series of negotiations that the parties clearly anticipated would lead to arbitration if they were not resolved." (Def.'s Reply Pl.'s Resp. Mot. Dismiss and Compel at 6.) It points out that the Billings Letter contained a threat to arbitrate, but not an arbitration demand, and that Plaintiff has never communicated to Defendant a request to proceed to arbitration. Instead, according to Defendant, Plaintiff continued to negotiate the dispute in writing through the winter months of 1998 but then abandoned those negotiations by ignoring its obligation to arbitrate and filing a lawsuit in March of 1999.

In support of its argument that Defendant has waived its right to arbitration, Plaintiff relies on *Menorah Ins. Co., Ltd. v. INX Reinsurance Corp.*, 72 F.3d 218 (1st Cir.1995). In *Menorah*, the First Circuit affirmed the district court's finding of waiver based on three considerations: (i) the defendant expressly rejected the plaintiff's written request that the parties proceed to arbitration, (ii) the defendant first demanded arbitration fifteen months after the dispute arose, and (iii) the plaintiff was prejudiced by the delay and by the costs it incurred in attempting to resolve the dispute after the defendant refused to arbitrate. *See Menorah*, 72 F.3d at 221–222. Examination of the facts presented here against the backdrop of *Menorah* belie Plaintiff's contention that a waiver has occurred in this case.

The dispute between these parties arose when Defendant refused, in the late spring or early summer of 1998, to pay a bill issued by Plaintiff. In the Billings Letter of June 17, 1998, one of Plaintiff's agents indicated to Defendant that Plaintiff might request arbitration if the dispute was not resolved to its satisfaction. Defendant never responded to this statement in the Billings Letter. No actual arbitration request was ever made by Plaintiff. The parties corresponded further regarding the dispute between June 17, 1998 and the winter months of 1998 with no mention of arbitration. (Billings Aff. at 3; Def.'s Reply Pl.'s Resp. Mot. Dismiss and Compel at 6.) Plaintiff filed a Complaint in this court on March 8, 1999. Defendant filed the pending Motion concerning arbitration on May 10, 1999 and has filed no pleadings in this action.

The defendant in this case simply is not similarly situated to the defendant in *Menorah*. First, unlike the defendant in *Menorah*, Defendant did not expressly reject a written request to arbitrate. Rather, it merely did not respond to a written statement threatening to demand arbitration if it did not change its position. There was no arbitration demand to ignore or reject. Second, with respect to delay, while it is true that Defendant did not invoke its right to arbitration until approximately one year after the dispute first arose, this fact is not in and of itself meaningful. *See Menorah*, 72 F.3d at 222 ("There is no per se rule that a one year delay is or is not sufficient to support waiver."). Here, it is uncontested that the parties were engaged in written negotiations from June 1998 through the winter months of 1998. There is no reason to think that either party had reason to request arbitration while those negotiations continued. Furthermore, the Court observes that Defendant raised the issue of arbitration in a timely fashion after Plaintiff's Complaint was filed and has not submitted any pleadings in this case. Defendant cannot be said to have taken any legal action "inconsistent with its [arbitration] right." *Jones Motor Co., Inc. v. Chauffeurs, Teamsters & Helpers Local Union No. 633 of New Hampshire*, 671 F.2d 38, 44 (1st Cir.1982) (quoting *Reid Burton Constr., Inc. v. Carpenters Dist. Council of Southern Colo.*, 614 F.2d 698, 702 (10th Cir.1980)).

Finally, the Court is not persuaded that Plaintiff has been prejudiced by

any of Defendant's actions. As another court has explained, "[i]t is not enough to simply claim prejudice." *Lifetime Med. Nursing Serv., Inc. v. Cambridge Automation Corp.,* 780 F.Supp. 882 (D.R.I.1991). It must be demonstrated. In this case, Plaintiff argues that it has been prejudiced by Defendant's actions because Defendant has delayed Plaintiff's effort to resolve this dispute outside of litigation, has avoided paying its portion of the bill for over a year, and has forced Plaintiff to the expense of litigation. With respect to the first two concerns, Plaintiff asserts, in essence, that it has been prejudiced by what strikes the Court as the predictable consequence of protracted and apparently unsuccessful negotiations in which Plaintiff participated on a voluntary basis. As far as Plaintiff's initiation of this lawsuit, the decision to follow this course, rather than to request arbitration at an earlier point, was Plaintiff's own. There is no evidence that Defendant foiled an earnest attempt by Plaintiff to proceed to arbitration. In light of all of the considerations discussed above, the Court concludes that Defendant has not waived its right to arbitration.

### 4. Motion to Stay Versus Motion to Dismiss

As a final matter, the Court must decide whether Defendant's Motion is properly framed as a motion to dismiss. Plaintiff contends that the Court's determination that the parties are bound by an arbitration clause does not affect the Court's subject matter jurisdiction over its claims, and therefore the Court should treat Defendant's Motion to Dismiss as a Motion to Stay. Defendant responds that where parties have agreed to arbitrate, the Court

lacks subject matter jurisdiction, but goes on to request that "to the extent necessary, ... this court consider [the] motion as one to stay and compel arbitration." (Def.'s Reply Pl.'s Resp. Mot. Dismiss and Compel at 5.)

A review of First Circuit precedent indicates that where, as in this case, a court determines that all claims raised by the plaintiff are subject to arbitration, the court may dismiss the entire action, rather than staying it.[9] *See Bercovitch v. Baldwin Sch., Inc.,* 133 F.3d 141, 156 n. 21 (1st Cir.1998) ("a court may dismiss, rather than stay, a case when all of the issues before the court are arbitrable"); *Sea–Land Serv., Inc. v. Sea–Land of P.R., Inc.,* 636 F.Supp. 750, 757–58 (D.P.R.1986) ("Given our ruling that all issues raised in this action are arbitrable and must be submitted to arbitration, retaining jurisdiction and staying the action will serve no purpose.").

In this case, however, in light of the particular features of Article XV,[10] the Court concludes that dismissal would be inappropriate. As a result, the Court stays the pending action under section 3 of the FAA and orders, pursuant to section 4, that the parties proceed to arbitration in accordance with the procedures established in Article XV of the Joint Pole Agreement.

### III. CONCLUSION

For the reasons discussed above, Defendant's Motion to Dismiss for lack of subject matter jurisdiction and to Compel Arbitration is treated as a Motion to Stay and Compel Arbitration and is GRANTED. This action is stayed and the parties

---

**9.** In such an instance, dismissal has several advantages:

Any post-arbitration remedies sought by the parties will not entail renewed consideration and adjudication of the merits of the controversy but would be circumscribed to a judicial review of the arbitrator's award in the limited manner prescribed by law. This course of action will also make the arbitrability issue immediately appealable

and will avoid the litigation expenses and delay if the arbitration conducted were vacated by a later appeal.

*Sea–Land Serv., Inc. v. Sea–Land of P.R., Inc.,* 636 F.Supp. 750, 757–58 (D.P.R.1986) (citations omitted).

**10.** Article XV specifies that the parties will be bound by the arbitrator's factual findings.

**162**

are ordered to proceed to arbitration in accordance with the procedures established in Article XV of the Joint Pole Agreement.

*SO ORDERED.*