**WINTERWOOD FARM, LLC, Plaintiff**

v.

**JER, INC., Defendant**

**No. 04–93–P–H.**

United States District Court,
D. Maine.

July 26, 2004.

Aaron P. Burns, Smith, Elliott, Smith & Garmey, P.A., Saco, ME, Keith Jacques, Smith, Elliott, Smith & Garmey, P.A., Portland, ME, William S. Kany, Smith, Elliott, Smith & Garmey, P.A., Saco, ME, for Winterwood Farm LLC, Plaintiff.

David A. Lourie, Law Office of David Lourie, Cape Elizabeth, ME, for Jer Inc, Defendant.

### MEMORANDUM DECISION ON DEFENDANT'S MOTION FOR STAY

DAVID M. COHEN, United States Magistrate Judge.

Defendant JER, Inc. ("JER") moves pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 3, for a stay of the

instant action pending arbitration of the claims of plaintiff Winterwood Farm, LLC ("Winterwood"). *See* Defendant's Motion for Stay Pursuant to 9 U.S.C. § 3, etc. ("Motion") (Docket No. 9); *see also* Complaint (Injunctive Relief Requested) ("Complaint") (Docket No. 1). For the reasons that follow, I grant the Motion.

## I. Applicable Legal Standard

Issuance of a stay in favor of arbitration is governed by 9 U.S.C. § 3, which provides in its entirety:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

## II. Factual Context

For purposes of adjudication of the Motion, materials submitted by JER, together with the allegations of the Complaint, establish the following:

JER was set up to market a compost made from shellfish waste generated by Portland Shellfish Co. and others, to be sold under the name "Gardener's Gold." Affidavit of Jeffrey Holden ("Holden Aff."), Attachment # 1 to Motion, ¶ 2. In October 2001 JER and Winterwood entered into the written agreement referred to in the Complaint ("Output Contract"), which had as its stated object JER's exclusive purchase of Winterwood's high-grade compost. *Id.* ¶ 3; *see also* Output Contract, Exh. A to Holden Aff., at 1.

Pursuant to the Output Contract, the parties agreed that Winterwood would compost shellfish and seafood in a manner and in accordance with recipes mutually agreed to by both parties. Output Contract ¶ 1.2. Winterwood agreed to deliver its entire output of finished seafood compost to JER upon maturity, with the exception of specified amounts of compost that Winterwood reserved the right to sell directly to four designated customers. *Id.* ¶ 1.3. JER trucks were to pick up the compost at Winterwood's waste-composting facility. *Id.* Winterwood could invoice JER "for all compost as soon as it is screened, finished and ready to be bagged," with "[a]ll finished products [to] be stored in a designated area" on Winterwood's property. *Id.* ¶ 1.4. The Output Contract also provided, *inter alia:*

> 3.8 *ARBITRATION.* All claims, disputes and other matters in question arising out of, or relating to, this Agreement or the breach thereof shall be decided by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association then obtaining unless the parties mutually agree otherwise....

> \* \* \* \* \* \*

> 3.14 *EXTENT OF AGREEMENT.* This Agreement represent[s] the entire and integrated Agreement between the parties and shall supersede all prior negotiations, representations, or agreements, either written or oral. This agreement may be amended only by written instrument signed by both parties.

> \* \* \* \* \* \*

> 3.16 *RELATIONSHIP OF PARTIES.* Nothing contained herein shall be construed as creating any form of part-

nership or joint venture between the parties hereto.

*Id.* ¶¶ 3.8, 3.14, 3.16.

After execution of the Output Contract, Winterwood repeatedly requested that reference to "Winterwood Farm" appear prominently on compost bags sold by JER. Holden Aff. ¶¶ 3–4. JER's compost bags were redesigned, with input from Winterwood, in the fall and winter of 2002–03. *Id.* ¶ 5. Reference to Winterwood on bags of compost appears only once, at an inconspicuous location at the bottom of the bag in the section set aside for the "Guarantee" of Gardener's Gold Compost. *Id.* ¶ 6; *see also* Exh. B to Holden Aff. This reference is limited to the statement: "Gardener's Gold is produced on Winterwood Farm, a working Maine Farm." Holden Aff. ¶ 7. The inclusion of the reference to Winterwood on the redesigned JER bag was made at Winterwood's insistence shortly before Winterwood filed an application to register its name as a trademark. *Id.* ¶ 8.

JER ordered 100,000 bags printed containing the reference to Winterwood at JER's sole cost. *Id.* ¶ 9. Winterwood thereafter terminated the Output Contract—improperly in the view of JER President Jeffrey Holden. *Id.* ¶¶ 1, 10. Winterwood has never sent any demand for arbitration to JER. *Id.* ¶ 14. JER has not purchased any additional compost since the purported termination of the Output Contract by Winterwood. *Id.* ¶ 18. Winterwood is now in direct competition with JER in the sale of compost. *Id.* ¶ 19. Despite the arbitration clause in the Output Contract, Winterwood filed a complaint in Superior Court for breach of the Output Contract, seeking an *ex parte* attachment. *Id.* ¶ 20. When the Superior Court denied an *ex parte* attachment, Winterwood did not pursue the issue of attachment further. *Id.* ¶ 21. The parties to the Superior Court action have since agreed to notify the Superior Court that the claims asserted in the state court will be submitted to David Plimpton, Esq., for arbitration. *Id.* ¶ 23.

Winterwood filed the complaint in this action on May 7, 2004, *see* Docket No. 1, bringing two counts under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, for JER's alleged (i) false designation of origin and (ii) infringement of Winterwood's registered trademark by use without authorization, *see* Complaint ¶¶ 1–21, and also suing JER for causing likelihood of confusion or misunderstanding as to source, sponsorship or approval of goods in violation of Maine's Uniform Deceptive Trade Practices Act ("DTPA"), 10 M.R.S.A. § 1211 *et seq.*, *see id.* ¶¶ 22–24.

Winterwood alleged, *inter alia:*

6. On or about October 11, 2001, Winterwood entered into an agreement with JER by which Winterwood would supply its proprietary Compost blends exclusively to JER for marketing under JER's brand or brands throughout the United States.

7. Beginning from about October 2001, JER did begin packaging and marketing Winterwood's Compost in bags and other containers bearing, in addition to its own brands, a then-true designation of the source and maker of the branded Compost as Winterwood Farm Compost.

8. On or about August 2003, JER became financially and otherwise unable to continue to purchase and move in commerce further quantities of Winterwood's Compost, including 8000 yards of said Compost already produced by Winterwood for JER, which JER then allowed to lay fallow and deteriorate in storage.

9. Winterwood has bec[o]me aware that JER is marketing, selling and supplying both compost made and/or supplied by others and old, deteriorated,

and possibly contaminated Compost from storage in bags and other containers now falsely designating the source of the contents to be from Winterwood Farm.

10. On or about October 14, 2003 Winterwood notified JER and demanded that JER remove and no longer use said designation of origin in its marketing and promotional materials.

*Id.* ¶¶ 6–10. With respect to its Lanham Act cause of action for false designation of origin (Count I), Winterwood further asserted:

11. JER's past, present, and continuing false designation of origin as Winterwood Farm of compost not produced by Winterwood and/or, by age, contamination, and deterioration, no longer meeting the high quality standards of Winterwood, has caused and causes confusion, mistake, and deceit among resellers, consumers, and users of soil amendment products as to the origin, quality, and efficacy of the compost products so sold by JER.

12. As a result of JER's false designation of origin and the confusion, mistake, and deceit following directly therefrom, Winterwood has been and is being severely damaged in that its reputation as a producer of quality soil products, the reputation for high quality of its proprietary Compost, and the value of its proprietary Compost have been and are being diminished and destroyed.

*Id.* ¶¶ 11–12. With respect to its Lanham Act cause of action for trademark infringement (Count II), Winterwood alleged, *inter alia:*

15. After the failure of JER to fulfill its contractual obligations to market, sell, and distribute the Winterwood Compost products, Winterwood, having used the trade name Winterwood Farm for years, contemplated the development of the Winterwood Farm brand for soil

amendments, and is the owner of the trademark WINTERWOOD FARM for use on soil amendments, including compost.

16. Winterwood filed application for registration of its WINTERWOOD FARM trademark ... in the United States Patent and Trademark Office on the basis of its *bona fide* intention to use said trademark in interstate commerce.

17. In 1994 Winterwood began advertising its Compost and other related goods in connection with its WINTERWOOD FARM trademark, and on or about March 2, 2004, Winterwood began using its WINTERWOOD FARM trademark on such goods in commerce as defined in the Act . . . .

18. JER's continued use of Winterwood Farm on packaging and in connection with compost and related goods sold in commerce misleads consumers into believing that JER is affiliated with Winterwood, and causes confusion, mistake, and, deceit of and among consumers as to the source of the goods so sold by JER[.]

19. JER is infringing on the trademark WINTERWOOD FARM by making use of that term on its packaging materials without authorization from Winterwood.

20. JER's infringement of the WINTERWOOD FARM trademark further causes mistake and leads third parties to believe that Winterwood produces inferior quality compost.

*Id.* ¶¶ 15–20. With respect to its DTPA cause of action (Count III), Winterwood further contended:

24. JER's action with regard to Winterwood's trade mark and trade name is such that it is causing likelihood of confusion or of misunderstanding as to the source, sponsorship or approval of the

goods sold by JER under Winterwood's trade mark and trade name. *Id.* ¶ 24.

JER President Holden states, on information and belief, that (i) no contamination or deterioration of compost supplied by Winterwood occurred after it left the Winterwood site, and (ii) JER has purchased no additional compost since the purported termination of the Output Contract by Winterwood. Holden Aff.¶¶ 16–18.

JER has counterclaimed for (i) contamination of compost, (ii) value of bags rendered unusable and (iii) breach of the duty of good-faith dealing. *See* First Amended Answer With Defenses, and Counterclaims (Docket No. 7) ¶¶ 47–55. JER is not in default of its obligation to submit claims arising out of the Output Contract to arbitration, and is willing to submit the claims and counterclaims asserted in this action to binding arbitration. Holden Aff. ¶ 24.

### III. Analysis

■ Entry of a motion to stay pursuant to the FAA is appropriate to the extent that the court is "satisfied that the issue involved ... is referable to arbitration under [an agreement in writing for such arbitration]" and "the applicant for the stay is not in default in proceeding with such arbitration." 9 U.S.C. § 3. JER introduces uncontroverted evidence that it is not in default in proceeding with arbitration. However, the parties sharply dispute whether the claims raised in the Complaint are referable to arbitration pursuant to the Output Contract.

JER seeks stay of the instant action on the basis that the materials it submits establish that all claims Winterwood asserts "arise out of" the Output Contract. *See* Motion at 1. Winterwood rejoins that the Output Contract is unrelated to the Complaint inasmuch as (i) the Output Contract did not memorialize any agreement concerning either use of trademarks or potential unfair trade practices, (ii) even assuming *arguendo* the existence of an informal understanding between the parties regarding use of the Winterwood trademark, the integration clause of the Output Contract (section 3.14) renders any such unwritten agreement invalid and unenforceable, and (iii) inasmuch as the parties proclaimed their intention that the Output Contract not be construed as creating a partnership or joint venture (section 3.16), they would have expressly addressed use of trademarks in that contract if they had intended "such a joint undertaking." *See* Plaintiff's Opposition to Motion for Stay and To Compel Arbitration ("Opposition") (Docket No. 11) at 1–3.

As a threshold matter, both parties agree that it is appropriate for this court to determine whether the claims in issue are arbitrable. *See* Opposition at 3–4; Defendant's Reply to Plaintiff's Response to Defendant's Motion for Stay ("Reply") (Docket No. 13) at 2–3; *see also, e.g.,* *Graham v. Smith,* 292 F.Supp.2d 153, 156 n. 3 (D.Me.2003) ("When parties disagree about whether they are bound by an arbitration agreement, the court, not the arbitrator, decides the issue, unless there is clear and unmistakable evidence that the parties intended to submit the arbitrability question itself to arbitration.").[1]

■ The question of arbitrability is one of contract interpretation: "It is bedrock that arbitration is a matter of contract and that a party cannot be required to submit to arbitration any dispute which he has not agreed so to commit." *Graham,* 292 F.Supp.2d at 156 (citations and internal quotation marks omitted). An ar-

---

1. To the extent that Winterwood suggests that the court should defer this determination, *see* Opposition at 3–4, I agree with JER that the issue is ripe for decision in connection with the instant motion, *see* Reply at 2–3.

bitration agreement, like other contracts, is construed with reference to "ordinary state-law principles that govern the formation of contracts[,]" *id.* (citation and internal quotation marks omitted), in this case the law of the State of Maine, *see* Output Contract § 3.13.

 Nonetheless, the task of assessing whether the parties have agreed to arbitrate a given matter is undertaken "with a healthy regard for the federal policy favoring arbitration." *Bercovitch v. Baldwin Sch., Inc.,* 133 F.3d 141, 148 (1st Cir.1998) (citation and internal quotation marks omitted). "Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Restoration Pres. Masonry, Inc. v. Grove Europe Ltd.,* 325 F.3d 54, 60 (1st Cir.2003) (citation and internal punctuation omitted).

With these precepts in mind, I find all three counts of the Complaint arbitrable. The parties chose broad language in defining the scope of arbitrable matters: "All claims, disputes and other matters in question arising out of, or relating to, this Agreement or the breach thereof[.]" Output Contract § 3.8; *see also, e.g., Collins & Aikman Prods. Co. v. Building Sys., Inc.,* 58 F.3d 16, 20 (2d Cir.1995) ("The clause in this case, submitting to arbitration 'any claim or controversy arising out of or relating to the agreement,' is the paradigm of a broad clause.") (citation and internal quotation marks omitted); *Newbridge Acquisition I, L.L.C. v. Grupo Corvi, S.A. de D.V.,* No. 02 Civ. 9839(JSR), 2003 WL 42007, at *3 (S.D.N.Y. Jan. 6, 2003) ("Here, the arbitration clause at issue is very broad, providing that 'any and all disputes which may arise out of or in connection with this Agreement shall be finally settled by arbitration in New York.' "); *Baychar, Inc. v. Frisby Techs.,* No. 01–CV–28–B–S, 2001 WL 856626, at *6 (D.Me. July 26, 2001) ("In analyzing contractual language pursuant to general common law principles, the Court first looks to the plain language of the agreement. In this case the arbitration clause [covering "[a]ny controversy or claim under or in relation to this Agreement, or any modification thereof"] is facially broad in scope.").

Although I find no published Maine case construing a phrase substantially similar to "arising out of, or relating to" in the context of an arbitration clause, I find instructive a Maine Superior Court case parsing similar language in an insurance-policy context: " 'Arising out of' is ordinarily held to mean originating from, growing out of, flowing from, incident to or having connection with. 'In connection with' is ordinarily held to have even a broader meaning than 'arising out of' and is defined as related to, linked to or associated with." *Acadia Ins. Co. v. Vermont Mut. Ins. Co.,* No. Civ.A.CV 02–440, 2003 WL 23185875, at *1 (Me.Super.2003) (citation and internal quotation marks omitted).

My research reveals that, in keeping with these basic definitions, courts have broadly construed similar language in the arbitration-clause context. Noncontractual claims have been held "related to" an underlying contract for purposes of arbitrability when those claims have been found to "touch[ ] matters covered by" or to be "interwoven with" the underlying contract—*i.e.,* when their adjudication requires reference to that contract. *See, e.g., Ford v. NYLCare Health Plans of Gulf Coast Inc.,* 141 F.3d 243, 250 n. 7 (5th Cir.1998) ("Whether described as 'touch[ing] matters covered by' the agreement, or 'interwoven with' the agreement, a tort claim is 'related to' the agreement [for purposes of an arbitration clause] only

if reference to the agreement is required to maintain the action.") (citations omitted); *Bangor Hydro–Elec. Co. v. New England Tel. & Tel. Co.*, 62 F.Supp.2d 152, 158–59 (D.Me.1999) (quantum-meruit, unjust-enrichment and equitable-contribution counts were "related to" contract, and hence arbitrable, when analysis of those counts required inquiry into reasonableness of plaintiff's expectation that defendant bear some costs of tree-clearance work, and that in turn would be distilled at least in part by reference to provisions of underlying contract governing parties' joint ownership and occupancy of utility poles); *McMahon v. RMS Elecs., Inc.*, 618 F.Supp. 189, 190, 192 (S.D.N.Y.1985) (finding two of three defamation claims to fit definition of "disputes and claims arising in connection with this Agreement"—and hence to be arbitrable—because they "necessarily turn[ed] on whether [plaintiff] was terminated with or without cause, an issue which involve[d] an interpretation of the contractual relationship between the parties.").

By these lights, one can discern that all three counts of the Complaint "relate to" the Output Contract. Count I of the Complaint alleges false designation of origin in violation of the Lanham Act. *See* Complaint ¶¶ 1–13. Count II alleges trademark infringement in violation of the Lanham Act, asserting that JER's continued unauthorized use of the mark "misleads consumers into believing that JER is affiliated with Winterwood," *id.* ¶ 18, "causes confusion, mistake, and deceit of and among consumers as to the source of the goods so sold by JER[,]" *id.*, and "further causes mistake and leads third parties to believe that Winterwood produces inferior quality compost[,]" *id.* ¶ 20. Count III alleges violation of the DTPA, echoing Counts I and II in contending that JER's usage of the trademark and trade name "is causing likelihood of confusion or of misunderstanding as to the source, sponsorship

or approval of the goods sold by JER[.]" *Id.* ¶ 24. The gravamen of all three counts thus is likelihood of confusion among consumers and others as to the source of goods sold. *See, e.g., International Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr.*, 103 F.3d 196, 200 (1st Cir.1996) ("Trademark infringement and unfair competition laws exist largely to protect the public from confusion anent the actual source of goods or services. The Lanham Act is cast in this mold. Generally speaking, the Act proscribes the unauthorized use of a service mark when the particular usage causes a likelihood of confusion with respect to the identity of the service provider.") (citations and footnote omitted).

As Winterwood acknowledges in its complaint, for a certain period of time following execution of the Output Contract, JER's designation of Winterwood as the source and maker of the branded compost was "then-true." *See* Complaint ¶¶ 6–7. Indeed, the Output Contract provided that Winterwood would sell virtually its entire output of finished seafood compost to JER; thus, so long as the parties hewed to the terms of the contract, JER's designation of Winterwood as the source of the compost it purchased from Winterwood presumably would not be false or misleading. Nor, during continuation of the contract, could consumers be misled as to the existence of an affiliation between Winterwood and JER or likely be confused as to whose product was whose. During that period of time, Winterwood and JER (though not partners or joint venturers) were indeed affiliated, and Winterwood essentially promised that it would have no third-party customers for its seafood compost apart from four clients to whom it expressly reserved the right to continue to make direct sales. *See* Output Contract § 1.3.

It follows that adjudication of all three counts of the Complaint necessarily would entail examination of the parties' relationship as set forth in the Output Contract, including whether that contract effectively was terminated and, if so, when.[2] All claims asserted in the Complaint thus are "related to" the Output Contract for purposes of the parties' arbitration clause. In accordance with 9 U.S.C. § 3, entry of a stay of the instant action pending arbitration is appropriate.[3]

## IV. Conclusion

For the foregoing reasons I conclude that the motion of JER to stay the instant action should be, and it hereby is, **GRANTED**.

2. Winterwood's argument that its claims are unrelated to the Output Contract inasmuch as that contract (i) does not expressly address use of trademarks or potential unfair trade practices and (ii) bars extrinsic evidence of any unwritten agreement, *see* Opposition at 2–3, is a red herring. In view of the breadth of the parties' chosen arbitration clause, the question presented is not whether the claims arise directly from the Output Contract but rather whether recourse to that contract is essential to adjudicate those noncontractual claims.

3. I recognize that the Motion, as well, misses the mark in two respects: that JER (i) relied on the "arising under" rather than the broader "related to" portion of the parties' arbitration clause and (ii) cited only one case, *B.V.D. Licensing Corp. v. Maro Hosiery Corp.*, 688 F.Supp. 961 (S.D.N.Y.1988), that is not particularly helpful (in fact, JER concedes in its reply memorandum that *Maro* is distinguishable). *See generally* Motion; Reply; *see also, e.g., Fairchild v. National Home Ins. Co.*, 17 Fed.Appx. 631, 632–33 (9th Cir.2001) ("[T]he clause requiring arbitration of 'any disputes arising hereunder' [is] narrower than one requiring arbitration of a dispute 'arising out of or relating to this agreement.' ... Thus, the phrase 'arising hereunder,' without more, covers a much narrower scope of disputes, *i.e.*, only those relating to the interpretation and performance of the contract itself.") (citations and internal punctuation omitted). Nonetheless, JER squarely raises the key question: whether the arbitration clause of the Output Contract can be read to encompass the claims made in the Complaint, rendering a stay pursuant to 9 U.S.C. § 3 appropriate.